UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

CIVIL ACTION NO. 5:15-CV-P158-TBR
(Electronically Filed)

QUINCY OMAR CROSS                                      PETITIONER

v.

RANDY WHITE, WARDEN                                   RESPONDENT

RESPONDENT'S RULE 5 ANSWER AND MEMORANDUM OF LAW
OPPOSING HABEAS PETITION

Comes the Attorney General of the Commonwealth of Kentucky as counsel for

Respondent, Randy White, Warden, Kentucky State Penitentiary, and hereby states that the

petition for writ of habeas corpus filed by Quincy Omar Cross should be denied and dismissed

with prejudice as discussed in the following memorandum.

PROCEDURAL HISTORY

A Hickman County, Kentucky, jury found Quincy Cross guilty of kidnapping (with an

aggravator of murder), intentional murder (with aggravators of first-degree sodomy and first-

degree rape), first-degree sodomy, first-degree rape, abuse of a corpse, and tampering with

physical evidence, for events surrounding the death of 18-year-old Jessica Currin.  He was

sentenced to life without the possibility of probation or parole.[1]  Transcript of Record,

---

[1] Cross was indicted with four co-defendants: Tamara Caldwell, Jeffrey Burton, Vinisha
Stubblefield, and Victoria Caldwell. Vinisha Stubblefield and Victoria Caldwell pleaded guilty in
May, 2007. The Cross case was severed from the cases of Tamara Caldwell and Jeff Burton. TR
VI, 802. Cross was convicted in April, 2008. Tamara Caldwell and Jeff Burton pleaded guilty in
September, 2008.

hereinafter, TR, VIII, 1086-1091.  The Kentucky Supreme Court affirmed his convictions and sentence on direct appeal in *Cross v. Commonwealth*, 2009 WL 4251649 (Ky. 2009) (2008-SC-000465).

On June 6, 2011, Cross tendered a *pro se* motion to vacate his sentence and judgment pursuant to Kentucky Rule of Criminal Procedure (RCr) 11.42 and a memorandum of law in support thereof.  TR Motion 11.42, VI, 1, 6; TR IX, 1118.  The Commonwealth filed a response on August 19, 2011.  TR IX, 1142.  The trial court denied Cross's motion on October 21, 2011.  TR IX, 1186. On February 7, 2014, the Kentucky Court of Appeals affirmed the trial court's denial of RCr 11.42 relief. *Cross v. Commonwealth*, 2014 WL 505575 (Ky. App. 2014) (2011-CA-002136). The Kentucky Supreme Court denied discretionary review on May 6, 2015.

On August 17, 2015, Cross filed a *pro se* petition for a writ of habeas corpus, in the United States District Court. RE 6. On October 13, 2015, Senior Judge Thomas B. Russell ordered Respondent to file an answer within 40 days. RE 8. On November 23, 2015, Magistrate Judge Lanny King granted Respondent's motion for an extension of time to file his Rule 5 Answer and memorandum on or before January 7, 2016.

With respect to allegations in the habeas petition, Respondent denies those allegations and states that Cross is not being unlawfully detained by the Commonwealth of Kentucky in violation of the Constitution or laws of the United States.

Some of Cross's claims and parts of some of his claims are procedurally defaulted because they weren't properly raised in the trial court or in the appellate courts. Excluding the

claims and parts of claims which are procedurally defaulted, it appears that Cross's claims have been presented to the Kentucky State courts and are probably exhausted. To the extent claims have not been properly presented to the Kentucky Supreme Court, such claims are procedurally barred. Kentucky law generally bars successive collateral attack motions and, in addition, imposes a three-year time limit from the date the conviction became final on appeal to file a claim in a collateral attack motion. RCr 11.42(3) and (10). *See also, McQueen v. Commonwealth*, 948 S.W.2d 415 and 949 S.W.2d 70 (Ky.1997) (two opinions on same case); *Palmer v. Commonwealth*, 3 S.W.3d 763 (Ky. App.1999); *Commonwealth v. Stacey*, 177 S.W.3d 813 (Ky. 2005); *Commonwealth v. Carneal*, 274 S.W.3d 420, 429 (Ky. 2008); *Gall v. Parker*, 231 F.3d 265, 316 (6th Cir. 2000); *Bowling v. Parker*, 138 F.Supp.2d 821, 849 (E.D. Ky. 2001), *affd.*, 344 F.3d 487 (6th Cir. 2003).  Hence any claim not previously presented to the Kentucky courts is procedurally defaulted under these provisions.

Respondent's Rule 5 Answer includes discs containing the trial videotapes and other related videotaped proceedings and a disc containing the Transcripts of Record. Also included are: copies of the appellate court briefs, the Kentucky Supreme Court's unpublished direct appeal opinion, and the Kentucky Court of Appeals unpublished collateral attack opinion.

**TRIAL EVIDENCE**

The following trial evidence has been taken from the Commonwealth's responsive direct appeal brief filed in the Kentucky Supreme Court on June 22, 2009, and included in the Rule 5 Answer:

Jessica Currin was 18 years old at the time she was murdered by Quincy Cross.[2] She had an infant son named Zion and had just moved into her first apartment. VR: 3/27/08; 9:20:40; 9:21:41; 9:23:32.   Vinisha Stubblefield testified that Quincy Cross killed Jessica. VR: 3/31/08; 9:01:59. On the night of Jessica's murder, Vinisha, who was Jessica's 15-year-old cousin, and Jessica spent the evening playing cards with two other girls, at the home of one of the girls. *Id.*, 8:44:09; 8:46:55; 8:59:10, 9:00:22.   At some point during the evening, Jessica decided she wanted to go home. *Id.*, 9:04:25.  Unfortunately, Vinisha could not find Jessica a ride home, so Jessica decided to walk. *Id.*, 9:09:21.

Sometime after that, Vinisha decided to go to find Jessica.  *Id.*, 9:10:39; 9:11:30.  Quincy Cross[3] drove by and picked up Vinisha. *Id.*, 9:11:10; 10:35:06.  She told Cross she was going to meet Jessica. *Id.*, 9:11:30.  Cross and Vinisha then stopped and picked up Victoria Caldwell.[4]

---

[2] The course of events regarding Jessica's murder began either on the evening of July 29, 2000, or in the early morning hours of July 30, 2000.

[3] Vinisha had met Quincy Cross in the year 2000, before Jessica Currin was murdered, when she went to visit Tamara Caldwell at Tamara's apartment. VR: 3/31/08; 8:50:47; 8:51: 58; 8:48:38. Tamara and Cross were dating in 2000. *Id.*, 10:17:03.

[4] Vinisha had known Victoria Caldwell through school; Victoria was younger than Vinisha. VR: 3/31/08; 8:47:27.

*Id.*, 9:11:47.  After that they drove to Austin Leech's house on Chris Drive.  *Id.*, 9:12:15;

10:36:08.  Although Quincy Cross had been driving a blue Pontiac, he switched cars with Austin

Leech, and took Austin's white Cadillac.  They left, taking Tamara Caldwell[5] and Jeff Burton

with them.  Cross, Vinisha, Victoria, Tamara and Jeff were in the car.  *Id.*, 9:13:37.  Cross was

driving.  *Id.*, 9:15:00.

The group then proceeded to look for Jessica so Vinisha could make sure Jessica had

gotten home safely.  *Id.*, 10:37:34.  It was sometime after midnight.  *Id.*, 10:38:00.  When the

five of them saw Jessica walking down the street, they stopped and Vinisha asked Jessica if she

wanted a ride; Jessica said yes; however, when Jessica got in the car, she told Vinisha to make

sure they were taking her home and that was it.  *Id.*, 9:15:13.  After Jessica got in the car, Cross

started rubbing on her and touching her in a sexual way; Jessica told him to stop.  *Id.*, 9:15:56;

9:16:09.  Everyone in the car, except Jessica, was using cocaine, pills, and marijuana while in the

car.  *Id.*, 9:16:38; 10:38:58.  Cross kept touching Jessica and wouldn't leave her alone.  *Id.*,

9:17:34.  Jessica told Cross to stop touching her; Cross then told Jessica that she was going to let

him touch her or else he was going to hit her.  *Id.*, 9:18:03; 9:18:25.

When the group arrived at Jeff Burton's house, Cross and Jessica were arguing back and

forth with each other.  *Id.*, 9:20:00; 9:20:40.  Cross reached his hand over and hit Jessica.  *Id.*,

9:20:52.  After that, everyone got out of the car and went inside the house.  *Id.*, 9:21:00.  Cross

---

[5] Tamara Caldwell and Victoria Caldwell were cousins. VR: 3/27/08; 8:48:38.

made Jessica walk in the house.  *Id*., 9:21:10.  Once inside, Cross told Jessica they needed to talk and took her to a back bedroom.  *Id*., 9:21:19; 9:21:28.  Tamara went into the bedroom next.  *Id*., 10:44:35.  The rest of the group was in the living room listening to music, when Cross came out and called Jeff into the bedroom about 10 or 20 minutes later.  *Id*., 9:22:02; 9:22:19; 9:22:32; 10:42:58.  About 20 minutes later, Jeff came out and told Vinisha to come into the bedroom.  *Id*., 9:22:54; 10:43:20.

When Vinisha entered the bedroom, Cross, Jeff, and Tamara were in the bedroom; Jessica was laying on the bed; Jessica was already unconscious.  *Id*., 9:23:13; 9:24:37.  Cross was standing over Jessica with a belt in his hand around her neck.  *Id*., 9:23:27.  Cross got on top of Jessica and started having sexual intercourse with her.  *Id*., 9:23:59; 10:49:36.  After Cross finished having sex with Jessica, Jeff had sexual intercourse with her.[6]  *Id*., 9:24:19.  Tamara was watching.  *Id*., 9:24:30.

 Cross instructed Vinisha to "do the same thing that they were doing to Jessica."  *Id*., 9:24:58.  Vinisha said she did "the sexual intercourse part."  *Id*., 9:25:07.  Jessica was unconscious when Vinisha was touching her.[7]  *Id*., 9:25:23.  Vinisha touched Jessica's breasts and her private areas.  *Id*., 9:26:14; 9:26:18.  She touched Jessica because Cross had told her to

---

[6] Victoria Caldwell testified that Tamara was holding Jessica's legs so Jessica would not move while Jeff was having sex with her.

[7] Vinisha testified both that Jessica was "unconscious" and that she was not breathing. VR: 3/31/08; 9:25:36.

6

do so.  Cross told Vinisha if she didn't touch Jessica, he was going to do Vinisha the same way he had done Jessica.  *Id.*,  9:26:18; 9:26:49.

About 15 or 20 minutes after that, Jeff told Victoria to come into the bedroom.  *Id.*, 9:27:19; 10:43:58; 10:44:03.  Victoria came in and also rubbed Jessica's "upper areas and her lower private areas."  *Id.*, 9:27:26.  They all "started making out and everything."  *Id.*, 9:27:40. They were kissing, rubbing, and touching each other.  *Id.*, 9:27:57.  Victoria and Jeff were making out and Tamara and Cross were making out.  *Id.*, 9:28:06.  Vinisha was watching.  *Id.* Then Vinisha and Victoria started making out.  *Id.*, 9:28:34.  Jeff also began rubbing and touching Victoria at the same time that Vinisha was rubbing and touching Victoria.  *Id.*, 9:29:20.

After everything was done and everybody had "got finished," Cross and Jeff moved Jessica's body out to the garage.  *Id.*, 9:30:24.  Cross then took Vinisha home.  *Id.*, 9:31:54.

At some point later, Victoria called Vinisha and told her to come back to Jeff's house. *Id.*, 9:32:33.  Victoria, Jeff, Austin Leech, and Isaac Benjamin were at the house when she arrived.  *Id.*, 9:33:06; 9:34:19.  Jessica's body was starting to smell so Jeff, Isaac, and Austin moved it out of the garage and put it in the trunk of Austin's white Cadillac.  *Id.*, 9:33:45; 9:34:04, 9:34:19.  They drove the body over to the middle school.  It was dark outside.  *Id.*, 9:34:55.  Jeff, Isaac, and Austin took the body out of the trunk.  *Id.*, 9:35:34.  Vinisha stood and watched while they poured gas on Jessica's body.  *Id.*, 9:35:49.  Jeff poured the gas and Vinisha struck the match and threw it on Jessica's body.  *Id.*, 9:36:24; 9:36:37.  They stood and watched and then they left.  *Id.*, 9:37:05.

7

Vinisha admitted that when she spoke to the police, after the body was found, she did not tell the police what had really happened.  *Id*., 9:40:01; 9:42:23.  Quincy Cross told her that if she told anyone what happened, he was going to do the same thing to her that he had done to Jessica; therefore, she "didn't say nothing."  *Id*., 9:40:54.  In fact, Vinisha told the police things that were not true.  *Id*., 9:42:43; 9:42:56; 10:09:07.

In January, 2005, Vinisha ran into Quincy Cross at a funeral in Tennessee.  *Id*., 9:43:21.  Cross questioned her about why she had told the police he was involved with Jessica's death; she told him she had not said anything to the police about him.  *Id*., 9:45:17.  Cross told Vinisha that if she was not at his grandmother's house (at the time) he would kill her.  *Id*., 9:46:23.

Vinisha pleaded guilty to tampering with physical evidence and abuse of a corpse for her part in the crimes, and received a seven year sentence.  *Id*., 11:05:22; 11:05:54; 11:06:18.

In July, 2000, Victoria Caldwell was 15 years old.  VR: 4/1/08; 8:38:30. Victoria met Quincy Cross through Patrick Caldwell, Tamara's brother, and through one of their cousins at a narcotics house when she was 10 or 11 years old.  *Id*., 8:49:25; 8:49:40.  She couldn't remember the exact year she met Quincy Cross, but it was years before Jessica's murder.  *Id*., 10:15:28. Victoria met Jeff at her sister's birthday party in April, 2000.  *Id*., 8:50:44; 8:51:02.  Victoria knew Vinisha because they had gone to both school and church together.  *Id*., 8:51:15.  Although she knew who Jessica Currin was, prior to July 29, 2000, Victoria did not really know Jessica. *Id*., 8:51:54; 8:52:04.

Victoria testified that Quincy Cross killed Jessica by choking her with a belt at Jeff Burton's house during the early morning hours of July 30, 2000.  *Id*., 8:52:29; 8:53:10; 8:53:16; 8:53:22.  Victoria, Jeff, Tamara, Vinisha, and Quincy Cross were all present when Jessica was killed.  *Id*., 8:53:34.  Victoria admitted she participated in some of the events surrounding Jessica's death.  *Id*., 8:53:41.

Victoria testified that, on the night of the murder, Vinisha and Jessica had come to Victoria's house and asked her if she wanted to hang out.  *Id*., 8:54:07; 8:55:10.  Vinisha told Victoria to watch for flashing lights on a car; they were going to hang out with the person in that car.  *Id*., 8:54:07.  Quincy Cross then pulled up driving a blue four-door car.  *Id*., 8:55:23.  Victoria, Vinisha, and Jessica got in the car and Cross drove to a house on Chris Drive.  *Id*., 8:55:41.  Cross went in the house and Austin Leech came from the back of the house with a white Cadillac.  *Id*., 8:56:21.  They switched cars and drove a couple of houses up and picked up Tamara Caldwell and Jeff Burton.  *Id*., 8:56:44; 8:57:06.  Quincy Cross was driving the car; Jessica was in the middle of the front seat between Cross and Tamara; Jeff was in the back seat, Victoria was in the middle, and Vinisha was on the other side of Victoria.  *Id*., 8:57:25.  After they picked up Tamara and Jeff, Cross began driving and he passed out cocaine.  *Id*., 8:58:55.  Victoria, Tamara, and Cross were all using cocaine in the car.  *Id*., 8:59:12.  Victoria and Jeff also took some ecstasy.  *Id*., 8:59:34.  The six of them then proceeded to Jeff's house which was located on Center Street.  *Id*., 8:59:58.

9

While they were driving to Jeff's, Cross and Tamara were rubbing on Jessica's legs.  *Id.*, 9:02:07.  Jessica was telling them to stop, but they did not stop.  *Id.*, 9:02:24.  When they reached the driveway of Jeff's house, Cross reached under the seat grabbed a bat and hit Jessica in the back of the head.  *Id.*, 9:03:18.  It was a small souvenir type bat.  *Id.*, 9:02:40.

After that everyone got out of the car.  *Id.*, 9:03:51.  Jeff and Cross carried Jessica through the side door of the house.  *Id.*  Jessica was not conscious at the time; she just went "limp."  *Id.*, 9:04:09.  Victoria was familiar with the house; she had been there on previous occasions to "hang out" and have sex with Jeff.  *Id.*, 9:04:24; 9:04:41.  Jessica was carried into Jeff's bedroom; Victoria was in the room when Jessica was placed on the bed.  *Id.*, 9:06:20.  .

After Jessica was laid on the bed, Cross tried to have oral sex with her; he touched his private part to her mouth, but her mouth wouldn't open.  *Id.*, 9:06:41. Cross then started "jacking off" and ejaculated on Jessica's face.  *Id.*, 9:07:03; 9:07:19.  They were all present in the bedroom.  *Id.*, 9:07:19.  Jeff then started having sexual intercourse with Jessica; Jessica started to wake up.  *Id.*, 9:07:39.  She was making noises and when she woke up she said she wanted to go home to her son; she kept repeating her son Zion's name.  *Id.*, 9:07:58.  At the time, Tamara was holding Jessica's legs to keep Jessica from moving while Jeff was having sex with her.  *Id.*, 9:08:32.

Cross hit Jessica in the back of the head with a tool and "she just knocked back out."  *Id.*, 9:01:00; 9:08:47; 10:46:06; 10:46:30. Victoria did not know what the name of the tool was but

she described it as being a long tool with a knob in the middle that made a clicking noise.[8]  *Id.*,

9:09:18.  After Cross hit Jessica in the head he then pulled his belt off and began strangling her.

*Id.*, 10:50:16; 10:50:50.  Victoria believed that Cross left the belt wrapped around Jessica's

neck.[9]  *Id.*, 10:51:39.  The belt was not in the bedroom when she cleaned up the room and

collected the sheets.  *Id.*, 10:53:05.

Victoria explained that Cross was wearing a black leather belt on the night of the murder.

She identified Cross's belt in a scene photograph of Jessica's body which was taken behind the

Mayfield Middle School.  There was a piece of belt laying beside Jessica's neck in the photo.

*Id.*, 9:11:44.  Victoria explained that Cross put the belt around Jessica's neck and started choking

her.  *Id.*, 9:12:22.  He was sitting on top of her chest and he just "kept pulling and pulling and

pulling on it."  *Id.*, 9:12:54.  Victoria could hear Jessica gasping for air; however, at some point

she stopped gasping.  *Id.*, 9:13:05.  Victoria knew Jessica was dead.  *Id.*, 9:14:11.

Cross then told everyone in the room that they "had to do something" and instructed

Victoria to perform oral sex on Jessica.  *Id.*, 9:14:36.  Jessica was already dead at the time.  *Id.*,

9:15:01.  Victoria performed oral sex on Jessica's corpse.  *Id.*, 9:15:01.  After Victoria did that,

---

[8] Victoria buried the socket wrench in her sister's back yard; the wrench was later dug up by the police and Victoria identified the wrench, at trial, as being the wrench used by Cross to hit Jessica. VR: 4/1/08; 10:40:40; 10:40:56; 10:41:05.

[9] Sgt. Kevin Pelfrey, with the KSP, collected part of a braided leather belt found near Jessica's body at the middle school. VR: 3/27/08; 1:40:12.

Cross told Victoria to kiss Jessica on the breast; Victoria complied. *Id.*, 9:15:18. Other people also performed sexual acts on Jessica's body. *Id.*, 9:16:09. Vinisha put her fingers into Jessica's "vaginal area." *Id.*, 9:16:16. Tamara made Jessica's hand touch her (Tamara's) private part. *Id.*, 9:16:37. After that, they started using drugs again and Cross told Victoria and Vinisha to perform sexual acts on each other. *Id.*, 9:12:10. As a result, they started kissing and performed oral sex on each other. *Id.* Jeff was standing over Victoria and Vinisha "jacking off." *Id.*, 9:17:39. Tamara was having sex with Cross on the floor. *Id.*, 9:17:28.

Afterward, Jessica's body was wrapped in a blanket; Victoria tied the blanket at the end. *Id.*, 9:18:01. Jeff and Cross carried the body out and put it in the garage. *Id.*, 9:18:41. Tamara, Vinisha, and Cross left. Victoria was told to clean up the rest of the stuff in the bedroom. *Id.*, 9:19:12. Victoria removed a pillow, pillow cases, and sheets and put them into a trash bag in the garage.[10] *Id.*, 9:19:23. Jeff then gave her another ecstasy pill and they had sexual intercourse. *Id.*, 9:19:54.

At some point later, while Victoria was still at the house with Jeff, Jessica's body had started to smell. *Id.*, 9:20:37. Although Cross was supposed to have come back, he never did.[11] *Id.*, 9:21:23. Victoria called Vinisha and asked her to come back to the house. *Id.*, 9:21:33.

---

[10] She ultimately threw a pillow case and a pillow from Jeff's bedroom into a dumpster. VR: 4/1/08;10:44:46. She threw the sheets to the bed away a couple of miles more up the road in a black trash bag. *Id.*, 10:45:27.

[11] Cross was in custody on drug related charges stemming from an arrest on the morning of July 30, 2000. VR: 3/27/09; 10:04:58.

Vinisha came back to the house.  *Id*.  Austin Leech and Isaac Benjamin also came.  *Id*., 9:21:50;

9:21:55.  After Austin arrived, he and Jeff had a conversation; it was starting to get late (at night)

and they put Jessica's body into the trunk of a white car that Austin had brought.  *Id*.,  9:22:20;

9:22:55. 9:23:03.  They took the body to a nearby middle school.  *Id*., 9:23:28.  Jeff and Austin

carried the body; one of them took the blanket off.  Victoria had the blanket and Jeff poured

gasoline on Jessica's body.  Austin gave Vinisha a match and she threw it on Jessica's body and

they left.  *Id*., 9:24:00.  The gasoline had come from Jeff's garage.  *Id*., 9:24:27.

   Victoria testified that she was aware of rumors that Jeremy Adams was the father of

Jessica's baby and that Carlos ("LoLo") Saxton was dating Jessica that summer.  *Id*., 9:25:13;

9:25:21.  Victoria admitted she had given many statements to the police that were untrue.  *Id*.,

9:24:34.  She admitted she made statements that caused Jeremy Adams and Carlos Saxton to be

charged with murder in spite of the fact that it was not true.  *Id*., 9:25:41; 9:26:11.  After that,

Victoria, suddenly, moved to California.[12]  *Id*., 9:26:45; 9:27:53.  She had not had any contact

with Vinisha Stubblefield "since all that happened."  *Id*., 9:27:09.  She lived in California until

2007.  *Id*., 9:28:56.  Victoria recalled receiving a phone call from Cross and Tamara in 2006; she

began talking to Det. Sam Steger in 2006.  *Id*., 9:29:19.

   While on the stand Victoria read some excerpts from a diary she kept during the year

2000.  One of the entries, dated August 1, 2000, said, "Damn, they found the body.  I hope they

---

[12] Before moving to California, Victoria and her family, due to fear, lived for short time with
Mayfield police officer Margie Saxton. VR: 3/28/08; 9:47:55; 9:50:44; 9:51:48; 9:54:38.

don't find out it was us. F*** man. Q is nowhere to be found and Jeff don't want to talk to me. This is bulls*** . . . . F*** I am out." *Id.*, 9:37:35. The next entry was dated August 8th and stated, "Man I am so scared. F*** people keep staring at me. What am I suppose to do?" *Id.*, 9:38:11. The next entry said, "Vinisha is looking dumb as h*** like she don't know . . . . Man, I quit school." *Id.*, 9:38:45.

Victoria pleaded guilty to tampering with physical evidence and abuse of a copse regarding her participation in the events surrounding Jessica Currin's murder. *Id.*, 10:19:05. In exchange for her plea of guilt, Victoria received five years. *Id.*, 10:32:00. She had, however, not been sentenced at the time of the trial. *Id.*, 10:18:58. Victoria conceded on cross-examination, that she had not always told the truth to law enforcement because she was afraid of them. *Id.*, 11:02:30; 11:03:02. She testified that her statements at trial were the truth. *Id.*, 11:04:01. Everything she had told Officer Tim Fortner in 2000 was a lie, including the fact that Jeremy Adams and Carlos Saxton were the actual murderers. *Id.*, 11:15:19. She admitted she told Trooper Steger the same lie as late as April of 2006. *Id.*, 11:15:34. She admitted to lying to the Mayfield Police, the Kentucky State Police (KSP), and the Kentucky Bureau of Investigation (KBI) in an effort to conceal the facts surrounding the death of Jessica Currin. *Id.*, 11:40:50.

Shortly after Jessica's murder, Deputy Sheriff Mike Perkins encountered Quincy Cross in the early morning, daylight, hours of Sunday, July 30, 2000. VR: 3/27/08; 9:46:26; 9:46:50. Cross identified himself as Quincy Orlando Jones and indicated that he had run out of gas. *Id.*, 9:47:21. Cross did not have on a belt; he kept pulling his pants up. *Id.*, 9:48:52. Cross said he

14

had been at a party the night before and had gone to Tennessee after he left the party in Mayfield and had seen some girls there. *Id*., 9:56:02. He stated he was going to drive to Tennessee and see if he could find the girls that he had seen. He stated he realized he was low on gas and was going to head back towards the house from which he had borrowed the car. The deputy sheriff took Cross back to 597 Chris Drive. *Id*., 9:57:32. The deputy sheriff was familiar with the address of the house based on his experience as a detective in the narcotics unit. *Id*., 9:57:32. The deputy sheriff returned to the address to determine ownership of the blue Pontiac Grand Prix which Cross had been driving. *Id*., 9:58:29. The deputy sheriff found Cross to be in possession of cocaine and arrested him. *Id*., 10:04:38. Cross was not wearing a belt at the time of his arrest. *Id*. A white Cadillac which belonged to Austin Leech, was parked in the back of the residence; it seemed out of place; the car was incredibly clean. *Id*., 10:07:11; 10:16:20.

In August, 2000, Tim Fortner was a patrolman with the Mayfield Police Department; he was getting ready to be promoted to detective. VR: 3/27/08; 2:09:11. Officer Fortner was the first officer on the scene at the middle school when Jessica's body was discovered and he ultimately became the lead investigator on the case. *Id*., 2:10:00; 2:30:46.

During the course of his investigation, he interviewed Quincy Cross on August 1, 2000. *Id*., 2:37:57. Cross was asked about being at a party on Chris Drive, on the night the crimes occurred. Cross said he did not do drugs, but he was drinking. *Id*., 2:40:13. When Cross was asked where he was going when he was arrested on the morning on July 30th, Cross responded

15

that he was coming to Mayfield to visit his sister. *Id*., 3:35:02. He could not give the police an address or describe where she lived. *Id*.

In addition to Cross, Officer Fortner interviewed many other people, including Vinisha Stubblefield, Victoria Caldwell, Carlos Saxton, Greg Starks, Austin Leech, Travis Jackson, Jessie Alexander, and Jeremy Adams in an effort to determine what had happened to Jessica. *Id*., 3:42:08; 3:42:27; 3:46:27; 3:46:39; 3:47:04; 3:47:14; 3:47:17; 3:47:40; 3:48:28; 4:03:52.

Officer Fortner indicated that based on his investigation, he ultimately charged Jeremy Adams and Carlos Saxton in February, 2001, with murder and abuse of a corpse. *Id*., 4:06:06; 4:07:51; 4:14:43. The charges were dismissed against both defendants in February, 2003, because the trial court found that the trial court's rules regarding discovery had been violated. *Id*., 4:07:16; 4:15:29. He clarified that evidence was not being hidden by the Commonwealth. *Id*., 4:15:29.

Dr. Mark LeVaughn was the medical examiner for the Commonwealth of Kentucky in August, 2000. VR: 3/28/08; 8:48:01. On August 1, 2000, he was called to the Mayfield Middle School, to examine the body that had been found there. *Id*., 8:48:51. There was significant insect and maggot activity at the scene where the body was found. *Id*., 8:50:17. He performed an autopsy on August 2, 2000. *Id*. Dr. LeVaughn described various decompositional changes in the body which included bloating, swelling, and peeling away of the skin. The tissue on the body was rotting and there was scavenger activity. *Id*., 8:54:58. Jessica's body had received both second and third degree burns to the chest and the abdomen. *Id*. In addition, there were

16

traumatic injuries on Jessica's head and face including two lacerations on the back of her head, one laceration on the bridge of her nose, and a laceration on her chin. *Id.*, 8:56:48; 8:57:00. Dr. LeVaughn made a diagnosis of "thermal injury." *Id.*, 8:57:00. He also noted two linear defects to the skin, which looked like stab wounds, a superficial defect on the tissue of the arm and another linear defect in the lung tissue. There was no way, however, to look at the skin because it was decomposed or gone. Therefore, Dr. LeVaughn could not say that she had been stabbed.

Dr. LeVaughn testified that the cause of death was strangulation.[13] He based his diagnosis on the fact that the charred remnants of a leather belt were found at the scene beside Jessica's neck. *Id.*, 9:03:01. The location of the belt was significant because it was out of place and was in a significant location with the body. Although he did not see any classic findings of strangulation, he testified that he didn't have a problem with that because, due to the decomposition and thermal injury, any lesions on the skin might not be viewable or identifiable. *Id*. He also explained to the jury that ligature strangulation, as opposed to strangulation using hands, takes less pressure and, as a result, classic injuries of a manual strangulation are not necessarily seen with a ligature strangulation. *Id.*, 9:05:21. He estimated that she had been dead a day or two due to the extent of the decomposition. *Id.*, 9:16:29.

On cross-examination, Dr. LeVaughn testified he performed a complete autopsy and looked for other causes of death, besides strangulation, and found none. *Id.*, 9:31:24. He opined

---

[13] Dr. LeVaughn also testified that Jessica died as a result of a combination of blunt injury and strangulation. VR: 3/28/08; 9:15:52.

17

that Jessica died as a result of strangulation.  *Id.*, 9:29:35.  He further testified he did not see any evidence of sexual assault at the autopsy; however, he explained that because her body was decomposed, minor injuries could have been hidden.  *Id.*, 9:32:29.  Dr. LeVaughn could say with reasonable medical certainty that Jessica was strangled.  He based that on the location of the belt and the lack of other findings for the cause of her death.  *Id.*, 9:35:46.

Greg Starks testified that on Saturday, July 29, 2000, he, along with Travis Jackson, Jessie Alexander, and Carlos Saxton, were hanging out at a house located at 597 Chris Drive.  VR; 3/28/08; 10:24:05; 10:24:37; 10:24:23.  Greg, Travis, and Carlos decided to drive Union City, Tennessee, to see Travis's "cousin," Quincy Cross.  *Id.*, 10:25:37.  After they got there, Cross obtained some cocaine for them.  *Id.*, 10:29:06.  Around 10:00 or 11:00 p.m., they all, including Cross, returned to 597 Chris Drive.  *Id.*, 10:30:00; 10:30:17.  Greg remembered people coming in and out of the house that night including Jeff Burton.  *Id.*, 10:30:53.  While at the house they were using cocaine, smoking marijuana, and drinking.  *Id.*, 10:31:28; 10:31:49.  Greg remembered Cross saying he wanted to "get some bitches."  *Id.*, 10:32:41.  Greg also recalled that Cross was wearing a belt that evening because Cross was flicking it around while he was talking to them in the living room.  *Id.*, 10:35:38.  It was a braided belt.  *Id.*, 10:36:29.  At some point during the evening, Cross borrowed Greg's Grand Prix.  *Id.*, 10:38:58, 10:39:22; 11:32:33.  Greg did not know how long Cross was gone with the car.  *Id.*  At some point, Cross returned with the car and told Greg that the car had run out of gas.  *Id.*, 10:40:14.

18

Greg also recalled police officers coming to the house that morning and detaining Cross; he recalled Cross giving the police "a bunch of different names and different social security numbers." *Id*., 10:41:22; 10:42:10.  Greg also told the jury that he did not have a gas can in his car that morning; Cross told Greg he had stolen it from a building somewhere. *Id*., 10:42:34.

Carlos Saxton testified that in the summer of 2000, he was just starting to date Jessica Currin.  VR: 3/31/08; 1:36:32.  Carlos last saw Jessica alive the night before the party on Chris Drive. *Id*., 11:37:34.  Carlos recalled hanging out at Chris Drive on the afternoon before Jessica was killed; he also recalled going to Tennessee with Travis and Greg to pick up some cocaine. *Id*., 1:44:09; 1:44:46.  They drove to Tennessee and picked up Quincy Cross who purchased cocaine for them out of a house in Lake County, Tennessee. *Id*., 1:46:33.  They arrived back at 597 Chris Drive around 10:30-11:30 p.m. *Id*., 1:50:26.  Cross said that he wanted to hook up with some girls or "bitches." *Id*., 1:54:07; 1:54:27.  Cross was wearing a black braided belt that night; he took it off and was swinging it around or playing with it for a while. *Id*., 1:57:40; 1:58:23.  At some point during the night, Carlos left to get some food from the Coffee Cup and brought it back to Chris Drive. *Id*., 1:56:26.  After he ate, he passed out. *Id*., 1:56:35.

A few months after the murder, Carlos was at Tamara Caldwell's house getting his hair braided when Cross approached him and accused him of telling the police that Cross had "killed that girl." *Id*., 2:03:13; 2:03:35; 2:07:03.  Carlos told Cross that the police had asked him questions and he was not going to tell them a story.  Carlos also noted that he had been charged with Jessica's murder in 2001; he testified he did not kill Jessica Currin. *Id*., 2:04:07; 2:04:24.

19

Jessie Alexander was living at 597 Chris Drive, in July 2000. VR: 3/28/08; 11:27:10.

Jessie recalled Greg, Travis, and Carlos leaving on the evening of July 29, 2000, to go get Quincy

Cross. *Id.*, 11:28:42. After they returned, everyone was using drugs and drinking. *Id.*, 11:29:12.

That was the first time Jessie had met Cross. He recalled that Cross was wearing a braided belt

that night; he remembered Cross swinging it in his hand. *Id.*, 11:30:32; 11:30:41. Cross was

arrested at the house the next morning. *Id.*, 11:33:26.

At some point later in time, Jessie ran into Cross in front of Food Giant. *Id.*, 11:34:41. A

car pulled up and Cross jumped out and accused Jessie of snitching on him "for killing that girl."

*Id.*, 11:35:01. Jessie, at first, did not realize what Cross was talking about until Cross said he

was talking about the girl who got murdered. *Id.*, 11:42:45.

Tamario Morgan was in the car with Quincy Cross on the day that Cross confronted

Jessie Alexander. *Id.*, 11:59:00. Tamario recalled telling the police he was watching T.V. with

Cross when something about the murder was televised; Cross made the statement, "Look, there

they go flashing across the T.V. again and they ain't caught me on it." *Id.*, 12:05:15. Tamario

was shocked. *Id.*. He also recalled telling the police that Cross stated, "I killed a girl with a belt

and they ain't got me on it." *Id.*, 12:06:05.

Tyrone Wilkey met Quincy Cross in the Graves County Jail in 2002. VR: 3/31/08;

3:10:34. During that time, Cross told Tyrone that he was dating Tamara Caldwell. *Id.*, 3:11:01.

He told Tyrone that he was there when Jessica Currin was killed but did not know who killed

20

her.  *Id.*, 3:11:21.  Cross also told Tyrone that he had been at a party off Cuba Road on the night Jessica was murdered.  *Id.*, 3:11:34.  Chris Drive was near Cuba Road.  *Id.*, 13:12:20.

Timothy Carr had grown up with Quincy Cross in Tennessee; he and Cross were like family.  VR: 3/31/08; 3:20:26; 3:20:37; 3:20:56.  Cross told Timothy that he (Cross) had sex with Jessica Currin on the night she was murdered.  *Id.*, 3:22:55; 3:23:28, 3:33:15.  Timothy did not remember telling Det. Steger that Cross had said he was there when Jessica was murdered.[14] *Id.*, 3:24:42; 3:24:52.  He did recall telling Det. Steger that Vinisha had hooked Quincy up with Jessica that night.  *Id.*, 3:25:55.  Timothy heard Cross threaten Vinisha at his grandmother's house.  *Id.*, 3:31:26.

Victoria's sister, Rosie Crice, testified that she knew Quincy Cross because he had been dating her cousin Tamara. VR: 4/1/08; 1:48:13.  Cross admitted to Rosie that he was there when Jessica was murdered; he said he saw them beat her and choke her.  *Id.*, 1:54:17.  Rosie also recalled Cross saying that Vinisha was there at the time Jessica was murdered and that he was going to kill her sister, Victoria Caldwell, because she was "running her mouth" about the case.  *Id.*, 2:03:02; 2:03:38; 2:04:38.  Rosie called Victoria and communicated the threat.  *Id.*, 2:06:01.

---

[14] Timothy had also made the following statement to Det. Steger in response to being asked if Cross told Timothy what Cross had done to Jessica: "She was getting her ass whooped. She was getting an ass whoopin'. You know what I'm saying? She was getting an ass whoopin' around him. But as far as that goes, you know, he said the body was burnt. You know what I mean? That came out of his mouth." VR: 3/31/08; 3:30:21. At trial, however, Timothy claimed Cross never said any of that to him. His explanation, while confusing, seemed to indicate that he had gleaned this from an argument he heard between Cross and Vinisha. *Id.*, 3:30:47; 3:32:19.

Rosie confirmed that a wrench was found in her back yard by the Kentucky State Police.[15]  *Id.*, 2:08:04; 2:08:47.

Cathy Frazier had grown up with Quincy Cross and had known him for more than 20 years.  VR: 4/2/08; 9:22:14.  She recalled discussing the subject of Jessica's murder with Cross sometime after October, 2001.  *Id.*, 9:23:35; 9:24:32.  Cross stated that Jessica overheard something she wasn't supposed to hear and "they had to take care of that."  *Id.*, 9:25:54.  She took it to mean that "he had done it, him and some more people."  *Id.*, 9:27:26.

Shamicia Powell knew Quincy Cross because he had dated her friend, Shannon Morgan.  VR: 4/2/08; 4:50:10; 4:50:19.  She recalled that one day while she and Shannon were walking they saw Cross.  *Id.*, 4:51:24.  Shannon and Cross began talking about the Jessica Currin case and Cross said he killed Jessica Currin.  *Id.*, 4:51:58.  He told Shannon and Shamicia if they said anything, he would do them the same way he had done Jessica.  *Id.*

After the Commonwealth announced that its case-in-chief was closed, trial defense counsel moved for a finding that Cross was not guilty based on insufficient evidence.  VR: 4/4/08; 9:04:00; 9:04:15.  The motion was denied by the trial court.  *Id.*

Trial defense counsel called a total of 17 witnesses, including four witnesses which had

---

[15] Trial defense counsel recalled Rosie Crice on April 3, 2008. At that time, Rosie changed her testimony and testified that Victoria had actually instructed her (Rosie) to say that Cross was trying to kill Victoria for running her mouth. VR: 4/3/08; 9:26:06. Rosie Crice later pleaded guilty to perjury for the untruthful testimony elicited by the defense on April 3, 2008. (See Judgment, attached as Appendix 1 to Commonwealth's direct appeal brief filed in the Kentucky Supreme Court on June 22, 2009).

previously been called by the Commonwealth in its case-in-chief:  Rosie Crice, Agent Bob O'Neal, Agent Lee Wise (VR: 4/3/08; 9:13:23; 1:58:09; 2:57:03), and Victoria Caldwell (VR: 4/7/08; 10:23:40).

In addition, trial defense counsel called four witnesses to testify that Victoria Caldwell was not always truthful.   Those witnesses included:  Savannah Caldwell, Antonio Caldwell, Mario Caldwell, and Brandi Bledsoe VR: 4/3/08; 10:01:25; 1:37;49; 1:46:24; 1:53:57.  In addition, Victoria Caldwell was recalled to establish that she had lied about certain things following the death of Jessica Currin.  VR: 4/7/08; 10:25:12.

Trial defense counsel also called Dr. George Nichols, the former Chief Medical Examiner for Kentucky.  VR: 4/7/08; 1:40:40.  Dr. Nichols could determine no anatomic cause of death. *Id*., 1:45:45.  He said Jessica might have been struck with an instrument causing injury to her brain and she could have been strangled, but there was no evidence to indicate that she was strangled.  *Id*.  He also testified there was no evidence of injury to the external genitalia of the decedent.  *Id*., 1:50:24.  On cross-examination, Dr. Nichols admitted he had never examined Jessica Currin's body.  *Id*., 1:59:49.  Dr. Nichols also conceded that if the soft tissues had been destroyed by decomposition or maggot activity, he would not expect to find an injury.  *Id*., 2:08:21.  He ultimately testified he could not say that Jessica Currin was not strangled.  *Id*., 2:17:09.

The defense theory was that the Commonwealth had chosen to prosecute the right people when it initially indicted Jeremy Adams and Carlos Saxton.  VR: 4/3/08; 9:10:00. Trial defense

counsel pointed out various lies told prior to Cross's trial by Victoria and Vinisha.  He also argued that Dr. LeVaughn was wrong about the cause of death.  *Id*., 9:05:30; 9:08:51.  In addition, trial defense counsel argued that Jessica Currin had not been raped.  *Id*., 9:09:04.

After the Commonwealth called Det. Steger in rebuttal to impeach the testimony of Rosie Crice, trial defense counsel moved for a directed verdict. VR:  4/7/08; 3:32:42.  His motion was overruled on the same grounds as before.  *Id*.  Trial defense counsel, shortly thereafter, in chambers, asked for reconsideration on the motion for directed verdict on the rape charge due to insufficiency of the evidence.  *Id*., 3:55:18.

As stated above, Cross was convicted of kidnapping (with an aggravator of murder), intentional murder (with aggravators of first-degree rape and first degree-sodomy), first-degree sodomy, first-degree rape, abuse of a corpse, and tampering with physical evidence.  He was sentenced to life imprisonment without the benefit of probation or parole. VR: 4/8/08; 4:06:35; VR: 4/9/08; 9:50:51.

## HABEAS STANDARD OF REVIEW

Before addressing Cross's claims, the Attorney General will discuss the standard of review for habeas corpus petitions. Title 28 U.S.C. § 2254 was amended by the enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The new § 2254(d) changed the standard of review in habeas corpus cases by providing for a greater level of deference for state court legal determinations.

24

Section 2254(d) states:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application, of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The amended provisions of § 2254(d) apply to all habeas corpus petitions filed after the effective date of the AEDPA. *Woodford v. Garceau,* 538 U.S. 202 (2003); *Michael Wayne Williams v. Taylor*, 529 U.S. 420, 428 (2000); *Terry Williams v. Taylor*, 529 U.S. 362, 402 (2000) (Part II of Justice O'Connor's opinion, joined by majority of the Court); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000).

## I.  Review of Legal Issues

(1) The standard of review for habeas cases under the AEDPA has been interpreted by the U.S. Supreme Court in *Terry Williams v. Taylor*, 529 U.S. 362, 402-413 (2000) (Part II of Justice O'Connor's opinion, joined by majority of the Court).  The *Terry Williams* opinion requires that in assessing a legal ruling of a state court, a federal habeas court must first determine whether there was a controlling rule prescribed by the U. S. Supreme Court.  If so, the federal court must determine whether the state court legal determination is contrary to that rule.

If there is no controlling rule, the federal court must determine whether the state court's decision resulted from an objectively unreasonable application of U.S. Supreme Court precedent. **The federal habeas court must determine the governing legal standard by reference to holdings (not dicta) of the U.S. Supreme Court that clearly established federal law governing state court trials at the time of the state court's ruling.** *Terry Williams v. Taylor*, 529 U.S. at 403-413. Also see *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). Any U.S. Supreme Court opinion issued after the state appellate court ruled upon the claim is not relevant to the reasonableness of the state court's ruling under Section 2254(d). *Greene v. Fisher*, 132 S.Ct. 38 (2011). "[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." 132 S.Ct. at 43-44. "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.... Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 134 S.Ct. 1697, 1706 (April 23, 2014), *reversing*, 685 F.3d 574 (6th Cir.).

(2) The state court's opinion is not required to discuss the applicable U.S. Supreme Court opinion under this standard. *Early v. Packer*, 537 U.S. 3, 8 (2002), explained, "A state-court decision is 'contrary to' our clearly established precedents if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially

26

indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' Avoiding these pitfalls does not require citation of our cases--indeed, **it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them**." (Citation omitted.  Emphasis added.)

(3) This standard of review applies even when the state court summarily rejected the federal claim without explaining its reasoning. *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011); *Parker v. Matthews*, 132 S.Ct. 2148, 2153 (2012).  *Also see*, *Bell v. Cone*, 543 U.S. 447, 455 (2005); *Mitchell v. Esparza*, 540 U.S. 12 (2003); *Slagle v. Bagley*, 457 F.3d 501, 513-514 (6th Cir. 2006); *Sanborn v. Parker*, 629 F.3d 554, 577-578 (6th Cir. 2010). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.***  When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. at 99.

## II.  State Court Findings on Factual Issues

(1) In addition to the mandates of §2254(d), §2254(e)(1) retains the presumption of correctness for "a determination of a factual issue made by a State court."  It requires that the petitioner "have the burden of rebutting the presumption of correctness by clear and convincing evidence."  The exceptions to the presumption of correctness that existed in the pre-AEDPA statute were deleted.

27

(2) The petitioner must initially plead facts in the habeas petition to overcome the presumption of correctness in order to permit the State to respond and to file appropriate parts of the state court record. *Loveday v. Davis*, 697 F.2d 135 (6th Cir. 1983), decided under pre-AEPDA statute. The Sixth Circuit has recognized  the continued validity of *Loveday* opinion after the enactment of AEDPA. *Clark v. Waller*, 490 F.3d 551, 555-556 (6th Cir. 2007).

(3) "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, §2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, §2254(d)(2)[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Also see, *Rice v. Collins*, 126 S.Ct. 969, 974 (2006), upholding state court finding of fact as reasonable under §2254(d)(2) even though opposite finding would have also been reasonable; *Schriro v. Landrigan*, 127 S.Ct.130 1933, 1939-1940 (2007); *Wood v. Allen*, 130 S.Ct. 841, 850-851 (2010), upholding state court finding of fact under §2254(d)(2) in spite of conflicting evidence on that point. "Findings of fact made by a state court are presumed correct and can be contravened only where the habeas petitioner shows by clear and convincing evidence that the state court's factual findings were erroneous. This presumption of correctness also applies to the factual findings of a state appellate court based on the state trial record." (Citations and quotation marks omitted.)  *Bugh v. Mitchell*, 329 F.3d 496, 500-501 (6th Cir. 2003).  Also see *Holland v. Jackson*, 542 U.S. 649 (2004).

28

(4) The presumption of correctness also applies to **implicit** findings in accordance with pre-AEDPA law. *Uttecht v. Brown*, 127 S.Ct. 2218 (2007); *Campbell v. Vaughn*, 209 F.3d 280, 285-286 (3rd Cir. 2000), citing, *inter alia*, *Marshall v. Lonberger*, 459 U.S. 422,  432-433 (1983) (state court implicitly discredited petitioner's evidence by denying petitioner's motion); *Weeks v. Snyder*, 219 F.3d 245, 258 (3rd Cir. 2000), collecting cases; *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003), "[A] presumption of correctness would apply to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."

(5) The presumption of correctness under §2254(e)(1) applies to state court findings of fact regardless of whether the state courts granted the petitioner a "full and fair" evidentiary hearing in state court because the AEDPA amendments deleted the exceptions to the presumption.  *Valdez v. Cockrell*, 274 F.3d 941 at 947-954 and 959 (5th Cir. 2001); *Smulls v. Roper*, 535 F.3d 853, 861-862 (8th Cir. 2008) (*en banc*); *Braxton v. Gansheimer*, 561 F.3d 453, 461-464 (6th Cir. 2009).  "Procedural imperfections ordinarily will not affect the presumption... [T]o 'presume' facts 'correct' means a court cannot allow a habeas applicant to evade Section 2254(e)(1) by attacking the process employed by the state *factfinder* rather the actual *factfindings*."  *Miller-El v. Cockrell*, 537 U.S. 322, 358 (2003) (Thomas, J., dissenting), also noting that statutory exceptions to presumption were deleted.

III.   Standard for Consideration of Facts Not Presented to the State Court

(1) Under the AEDPA amendments, habeas corpus petitioners are not automatically granted evidentiary hearings on the claims raised in their petitions. Review of the state court's

ruling upon a claim is limited by §2254(d) to the facts and evidence in the state court record and presented to the state court prior to the time of its ruling. *Cullen v. Pinholster*, 131 S.Ct.1388,1398-1399 (2011). Also see, *Bray v. Andrews*, 604 F.3d 731, 737 (6th Cir. 2011); *Moore v. Mitchell*, 708 F.3d 760, 780-784 (6th Cir.  2013); *Ballinger v. Prelesnik*, 709 F.3d 558, 561-562 (6th Cir. 2013), adopting, *Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011); *Price v. Thurmer*, 637 F.3d 831, 837 (7th Cir. 2011); *Rabe v. Thaler*, 649 F.3d 305, 308-309 (5th Cir. 2011); *Lewis v. Thaler*, 701 F.3d 783, 789-791 (5th Cir. 2012). "While allowing a petitioner to supplement [with additional evidence in federal court] an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* precludes it." *Ballinger v. Prelesnik*, *supra* at 562. This limitation upon the facts subject to review in federal court applies even when the state court rejected the claim for failure to plead sufficient facts in the collateral attack pleading. *Frazier v. Bouchard*, 661 F.3d 519, 527-528 and 532, fn. 17 (11th Cir. 2011), holding that evidence presented to the federal court under Habeas Rule 7 (supplementing the state court record) could not be considered under §2254(d) since it was not presented to the state court.

## IV.  Harmless Error Standard

(1) The 1996 AEDPA amendment to the habeas statute did not change the standard for harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which applies regardless of whether the state appellate court conducted harmless error analysis. *Fry v. Pliler*,

127 S.Ct. 2321 (2007), citing, *Penry v. Johnson*, 532 U.S. 782, 794-796 (2001), *Calderon v. Coleman*, 525 U.S. 141, 145 (1998), and distinguishing, *Mitchell v. Esparza*, 540 U.S.12 (2003).

(2) Even when a federal habeas corpus court concludes that a federal constitutional error occurred during the trial, such error does not warrant relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict" so that the error deprived the habeas petitioner of his right to a fair trial in violation of the Constitution of the United States. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *California v. Roy*, 519 U.S. 2 (1996); *Calderon v. Coleman*, 525 U.S. 141 (1998); *Coe v. Bell*, 161 F.3d 320, 335-336 (6th Cir. 1998); *Gilliam v. Mitchell*, 179 F.3d 990 (6th Cir. 1999). Also see, *Bonin v. Calderon*, 59 F.3d 815, 823-824 (9th Cir. 1995); *Moore v. Carlton*, 74 F.3d 689, 691 n.2 (6th Cir. 1996).

## V. Teague Non-Retroactivity Doctrine

(1) The U.S. Supreme Court has unanimously ruled that the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989), continues to apply independently of the standard of review established by the revised §2254(d). *Horn v. Banks*, 536 U.S. 266 (2002), *opinion after remand, sub nom. Beard v. Banks*, 542 U.S. 406 (2004); *Breard v. Greene*, 523 U.S. 371, 377 (1998); *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Whorton v. Bockting*, 549 U.S. 406 ( 2007); *Greene v. Fisher*, 132 S.Ct. 38, 44 (2011); *Chaidez v. United States*, 133 S.Ct. 1103 (2013). Also see *Green v. French*, 143 F.3d 865, 874 (4th Cir. 1998); *Fisher v. Texas*, 169 F.3d 295, 304 (5th Cir. 1999

31

VI.  <u>Procedural Default and State Court Collateral Attack Proceedings</u>

(1) A federal constitutional claim not presented to state courts at the time and in the manner prescribed by state law is treated as a procedurally defaulted claim.  A procedurally defaulted claim is reviewable by a federal habeas corpus court only after the habeas petitioner demonstrates both cause and actual prejudice to overcome the default or a "miscarriage of justice", *i.e.*, a colorable claim of factual innocence in light of federal constitutional error. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Coleman v. Thompson*, 501 U.S. 722 at 750 (1991); *Sawyer v. Whitley*, 505 U.S. 333 (1992); *Schlup v. Delo*, 513 U.S. 298 (1995); *Gray v. Netherland*, 518 U.S. 152 (1996), opinion on remand, 99 F.3d 158 at 161-164 (4th Cir. 1996); *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *West v. Seabold*, 73 F.3d 81 (6th Cir. 1996); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000); *Seymour v. Walker*, 224 F.3d 542, 549-551, 554-556, 557, and 560 (6th Cir. 2000); *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000); *Lynn v. United States*, 365 F.3d 1225, 1234-1235 (11th Cir. 2004), summarizing Supreme Court's rulings.  "[A]s a general matter, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised."  *Bell v. Cone*, 543 U.S. 447, 451, fn. 3 (2005). In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the U.S. Supreme Court explained, "If what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant.  Omission of the claim will not be excused merely because evidence discovered later

32

might also have supported or strengthened the claim." The petitioner must demonstrate actual prejudice, not merely presumed prejudice, as to a procedurally defaulted claim, even though presumed prejudice would otherwise apply. *Ambrose v. Booker*, 684 F.3d 638, 649-653 (6th Cir. 2012).

(2)The fact that the state procedural rule grants discretion to the state courts on when to apply it does not make the state procedural default rule invalid. *Beard v. Kindler*, 130 S.Ct. 612 (2009). "A discretionary rule ought not be disregarded automatically upon a showing of seeming inconsistencies." *Walker v. Engle*, 131 S.Ct. 1120, 1130 (2011).

(3) Failure to present a claim on appeal or motion for discretionary review to the state appellate court operates as a procedural default, unless state law provides otherwise. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001); *Alley v. Bell*, 307 F.3d 380, 385-386 (6th Cir. 2002).

(4) The same federal constitutional provision must be cited (or argued) as the basis for the claim in both state and federal courts. *Abdullah v. Groose*, 75 F.3d 408, 412 (8th Cir. 1996) (*en banc*), citing *inter alia*, *Duncan v. Henry*, 513 U.S. 364 (1995); *Jacobs v. Mohr*, 265 F.3d 407 (6th Cir. 2001). The claim must be identified as a federal constitutional violation in the motion or brief filed in the highest state court. *Baldwin v. Reese*, 541 U.S. 27 (2004).

33

## PRELIMINARY ARGUMENTS

At the outset, and in keeping with the principles set out in the Federal Habeas Standard of Review above, the Attorney General requests this court to apply 28 U.S.C. §2254(d) and (e) to all claims raised in the habeas petition.

The Attorney General also requests, in keeping with the principles set out in Part II of the Federal Habeas Standard of Review above, this court to apply the presumption of correctness to all State court findings of fact whether made by the trial court or the Kentucky Supreme Court. The Attorney General also requests, in keeping with the principles set out in Part IV of the Federal Habeas Standard of Review above, that this court conduct harmless error review for each claim where constitutionally permissible.

The Attorney General further requests, in keeping with the principles set out in Part V of the Federal Habeas Standard of Review above, that this court apply the *Teague* non-retroactivity doctrine to all claims which would require a new rule of constitutional law relative to the direct appeal finality date.

## PRELIMINARY STATEMENT

Cross's habeas petition lists, as his grounds for habeas relief, the claims raised in state court on direct appeal and most of the claims raised on collateral attack appeal, including two claims not raised on collateral attack, and three claims that Cross alleges were not presented to the state courts. Cross does not provide any legal argument in support of the claims listed; therefore, the Attorney General will presume Cross is raising each claim pursuant to the same

34

federal constitutional provisions as previously raised in state court, if previously raised in state court. The Attorney General will number each claim in chronological order, following the order of claims as listed by Cross, beginning in the habeas petition and continuing through the lists compiled and attached by Cross. Cross raises a total of 16 claims. The Attorney General will address the claims raised on direct appeal first (Habeas Grounds I-VII), the claims raised (or not raised) on collateral attack next (Habeas Grounds VIII-XIII), and the three alleged unexhausted claims last (Habeas Grounds XIV-XVI).

## ARGUMENT

### HABEAS GROUND I

**CROSS'S CLAIM THAT THE COMMONWEATH ENGAGED IN A "DOCUMENT DUMP" APPROACH TO DISCOVERY WAS ADDRESSED AND REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that the Commonwealth's "document dump" approach to discovery constituted prosecutorial misconduct. In a two-sentence paragraph at the end of his argument, he argued that the Commonwealth's approach violated his due process right to a fair trial and his Sixth Amendment right to prepare and present a defense.  In fact, a review of the record shows that the Commonwealth indexed and summarized the large amount of discovery it obtained from more than three different agencies over a seven-year

investigation of Cross and each of his co-defendants and turned it over to trial defense counsel

pursuant to the state criminal rules and to trial defense counsels' numerous detailed motions

asking the Commonwealth to provide even more discovery.  Discovery motions and related

issues were discussed, in detail, on at least two occasions: October 7, 2007 and December 18,

2007, and after careful consideration of the issues, the trial court found that the Commonwealth

was concerned about being accused of not providing discovery that might be available to it.  TR

VIII, 903.  The trial court found, *inter alia*, that the Commonwealth was acting in good faith in

providing discovery and that the Commonwealth had provided discovery in a timely manner.  TR

VIII, 903-904.

Cross previously raised this issue in his direct appeal brief in Argument I, on pages 12-20.

The Commonwealth responded in Argument I of its direct appeal brief, on pages 20-26, which is

hereby incorporated by reference. The Commonwealth described how discovery was indexed,

pointed out the numerous motions requesting discovery, and discussed the hearings and trial

court's rulings regarding discovery.

The Kentucky Supreme Court, in a unanimous opinion, found that the trial court did not

abuse its discretion in finding that there was no prosecutorial misconduct concerning the

Commonwealth's discovery production. The Kentucky Supreme Court stated:

> The trial court denied Appellant's motion, holding that the
> Commonwealth's production of thousands of pages of documents
> was an attempt to thoroughly comply with discovery requests, not
> prevent Appellant from developing a defense. The trial court
> further believed that the Commonwealth produced discovery in

stages because its investigation into the murder was on-going, the defense requested some documents be provided in several different formats, and the Commonwealth had trouble finding some of the information requested by the defense. Appellant now asks that we find the Commonwealth's discovery tactics were in fact a "document dump" and that we vacate his conviction.

The term "document dump" does not appear in Kentucky case law. A "document dump" has been described as:

> responding to a document request by the opposing party with ... as many colorably responsive documents as possible, [which] are turned over en masse in an effort to bury the opposition in paper, with the hope that with luck some material documents may be passed over, or at the very least, raise the cost to the opposition both in terms of money and time.

Steven Hetcher, *The Half-Fairness of Google's Plan to Make the World's Collection of Books Searchable,* 13 Mich. Telecomm. & Tech. L.Rev. 1, 43 (2006). Another scholar describes a "document dump" as where:

> the defendant is literally buried in thousands of pages of documents, many of which ... are often immaterial or irrelevant to both the prosecution and the defense. These documents may be produced in either hard copy or electronic format, leaving the defendant to sift through hundreds of boxes of documents ... in hopes of finding information, as if it were a needle in the haystack.

Morvillo, Bohrer, Baiter, *Motion Denied: Systematic Impediments to White Collar Criminal Defendants' Trial Preparation,* 42 Am.Crim. L.Rev. 157, 159 (2005). The practice of "document dumping" seemingly violates the spirit of Kentucky Rule Criminal Procedure 7.24, due to the rule's emphasis on reciprocal and open discovery.

A trial court's ruling on an alleged discovery violation is reviewed for an abuse of discretion. *Penman v. Commonwealth,* 194 S.W.3d 237, 249 (Ky.2006). Using that standard, we find no abuse of discretion in the trial court's denial of Appellant's motion. The record does not indicate that the Commonwealth intended to commit a discovery violation by "document dumping." The investigation into Currin's murder took seven years and was conducted by three different agencies: the Mayfield Police Department, the Kentucky State Police, and the Kentucky Bureau of Investigations. During this investigation many witnesses were interviewed numerous times and multiple indictments were sought. It is reasonable to believe that such a long, in-depth investigation would turn up a considerable amount of discovery. We also cannot dispute the trial court's factual finding that Appellant and his co-defendants requested some of the evidence be provided in different forms than originally produced. It is reasonable to believe that the Commonwealth's copious evidence production was an attempt to avoid a discovery violation for not producing all evidence required, especially in light of the discovery violations that ended up in the dismissal of Saxton and Adams's indictments in 2003. Further, it does appear from the record that the Commonwealth did make efforts to create indexes and assign Bates numbers to the different documents provided in discovery to aid Appellant's search. Moreover, the trial court had already granted Appellant a two-week continuance to review the Commonwealth's most recent discovery. We thus cannot find that the trial court abused its discretion by denying Appellant's motion to dismiss his indictments or his motion for an additional continuance. *See Penman,* 194 S.W.3d at 249-250.

*Cross v. Commonwealth*, 2009 WL 4251649, *4-5 (Ky. 2009) (2008-SC-000465). The United

States Supreme Court has stated,

The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the

38

> framework of the rules of evidence. To ensure that justice is done,
> it is imperative to the function of courts that compulsory process be
> available for the production of evidence needed either by the
> prosecution or by the defense.

*United States v. Nixon*, 418 U.S. 683, 709 (1974). The record reveals that the Commonwealth provided complete organized and indexed files in discovery in this long-investigated multi-defendant kidnapping/murder case, which spanned more than one state.

To the extent Cross's claim, if it does so, involves a claim that the state court discovery rules were violated, a state court's interpretation of state law is binding on federal habeas corpus courts. Violations of state law regarding discovery are not subject to review on federal habeas. *Lorraine v. Coyle*, 291 F.3d 416, 441-443 (6th Cir. 2002), and *LaMar v. Houk*, 798 F.3d 430-431(6th Cir. 2015), both quoting, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). The United States Supreme has stated, "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). Also see *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Houston v. Dutton*, 50 F.3d 381 (6th Cir. 1995); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986); *Israfil v. Russell*, 276 F.3d 768 (6th Cir. 2001); *Davis v. Straub*, 430 F.3d 281, 290-291 (6th Cir. 2005).

As noted in *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983), and in *Herrera v. Collins*, 506 U.S. 390, 401 (1993), "Federal Courts are not forums in which to relitigate state trials."  Hence errors of state law are generally not cognizable on federal habeas review.  *Engle v. Isaac*, 456

U.S. 107, 121, fn. 21 (1982); *Lewis v. Jeffers*, 497 U.S. 764, 781-784 (1990);  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Romano v. Oklahoma*, 512 U.S. 1, 10-14 (1994); *Wilson v. Corcoran*, 131 S.Ct. 13 (2010); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). The mere fact that the habeas petitioner disagrees with the state supreme court's interpretation of state law is not sufficient to establish a violation of the Federal Due Process Clause. *Chambers v. Bowersox*, 157 F.3d 560, 564-565 (8th Cir. 1998); *DiGuglielmo v. Smith*, 366 F.3d 130 (2nd Cir. 2004).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-103 (2011).

Although the Kentucky Supreme Court did not mention the Due Process Clause or the Sixth Amendment in rejecting the claim, the claims were implicitly rejected.  In *Johnson v. Williams*, 133 S.Ct. 1088, 1094 (2013), the United States Supreme Court recently noted that, "… it is not the uniform practice of busy state courts to discuss separately every single claim to which the defendant makes even a passing reference."  The Court further noted that "… a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim.  Federal courts of appeals refuse to take cognizance

40

of arguments that are made in passing without proper development." *Id*. at 1095.  In addition,

"… there are instances in which a state court may simply regard a claim as too insubstantial to

merit discussion." *Id*.  The Court noted that when a state court rejects a federal claim without

expressly addressing that claim, a federal habeas court must presume that the federal claim was

adjudicated on the merits, noting that that presumption could sometimes, in limited

circumstances, be rebutted.  *Id*.  1096.

      The Federal Due Process Clause does not regulate discovery methods and any ruling by

this court that clearly existing United States Supreme Court precedent was violated would create

a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489

U.S. 288 (1989).

      In any event, the alleged error complained of did not have "substantial and injurious

effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S.

619 (1993).

41

## HABEAS GROUND II

**CROSS'S CLAIM THAT THE CONFUSING NATURE OF THE JURY INSTRUCTIONS VIOLATED HIS RIGHT TO DUE PROCESS WAS ADDRESSED AND REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that the "confusing" nature of the jury instructions[16] violated his right to due process. Cross conceded that the jury instructions were not objected to in the Hickman Circuit Court. Although the claims were not properly preserved, the Kentucky Supreme Court addressed Cross's claims regarding the instructions in detail and found that the instructions did not violate Cross's due process rights.

Cross previously raised this issue in his direct appeal brief in Argument II, on pages 20-26. The Commonwealth responded in Argument II of its direct appeal brief, on pages 27-33, which is hereby incorporated by reference.

The Kentucky Supreme Court, in a unanimous opinion, found that the jury instructions, which combined accomplice and principal liability, were proper and did not expose Cross to subsequent prosecution; that the jury instructions were supported by adequate evidence; and that

---

[16] See jury instructions, attached to the Commonwealth's responsive direct appeal brief, as Appendix 3.

the jury instructions on accomplice liability and complicity were understandable. The Kentucky

Supreme Court stated:

### THE JURY INSTRUCTIONS DID NOT VIOLATE APPELLANT'S DUE PROCESS RIGHTS

Appellant next argues that the jury instructions provided by the trial court were erroneous. Appellant presents three arguments regarding the adequacy of the instructions: A) that the wording of the instructions prevents him from telling what theory of liability he was convicted of and he is thus prevented from defending himself against double jeopardy; B) that the evidence presented did not support all theories of liability included in the jury instructions; and C) that to the extent the jury instructions allowed a conviction on the basis of accomplice liability, the jury was never instructed on how to apply the definition for "complicity." Appellant concedes that his alleged errors are not preserved, so we review for palpable error. RCr 10.26. Each argument will be addressed separately.

### A. The jury instructions which combined accomplice and principal liability were proper and do not expose Appellant to subsequent prosecution

Appellant first argues that the jury instructions prevent him from determining under what theory of liability the jury found him guilty. As written, the jury instructions for capital murder and first-degree sodomy provided that the jury could find Appellant guilty of being either the principal actor, or of being complicit in some manner with Jeffery Burton or Tamara Caldwell in committing the crime. However, the instructions did not require that the jury specifically state under which theory of liability they found Appellant guilty. Appellant therefore argues that he is prevented from tendering a double jeopardy defense against subsequent prosecution on these same charges because he is unable to prove whether the jury found him guilty of being the principal or complicit actor.

43

Appellant's argument fails because it does not matter for the purposes of double jeopardy whether the jury found Appellant guilty of being the principal or complicit actor in the crimes. "KRS 502.020 does not create a new offense known as complicity. It simply provides that one who aids, counsels, or attempts to aid another in committing an offense with the intention of facilitating or promoting the commission of the offense is himself guilty of that offense." *Commonwealth v. McKenzie,* 214 S.W.3d 306, 307 (Ky.2007) (citing *Commonwealth v. Caswell* 614 S.W.2d 253, 254 (Ky.App.1981)). Thus, one who is convicted of complicity to a crime has the same status, and is guilty of the same crime, as one guilty of the principal offense. *McKenzie,* 214 S.W.3d at 307. Therefore, once Appellant was found guilty of murdering and sodomizing Currin under either theory of liability, pursuant to the principles of double jeopardy, the Commonwealth is prohibited from seeking a second conviction on those charges under a different theory of liability. Appellant has a double jeopardy defense against future prosecutions.

### B. The jury instructions were supported by adequate evidence and the jury's verdict was unanimous

Second, Appellant argues that the Commonwealth did not present adequate evidence at trial to support each of the theories upon which the jury was instructed, and therefore the jury's verdict was not unanimous. *See Davis v. Commonwealth,* 967 S.W.2d 574, 582 (Ky.1998) ("Unanimity becomes an issue when the jury is instructed that it can find the defendant guilty under either of two theories, since some jurors might find guilt under one theory, while others might find guilt under another. If the evidence would support conviction under both theories, the requirement of unanimity is satisfied."). The jury instructions for murder, first-degree sodomy, and first-degree rape all allowed a guilty verdict against Appellant if the jury found that he acted alone or in complicity with Tamara Caldwell and/or Jeffrey Burton. Appellant argues that the jury instructions violate the concept of unanimity because the Commonwealth did not present evidence that Burton or Caldwell participated in Currin's murder, or that Burton or Caldwell engaged in first-degree sodomy with Currin, or that

Appellant raped Currin. A review of the record refutes Appellant's argument.

First, sufficient evidence was presented that Burton and Caldwell were accomplices in Currin's murder. Accomplice liability can be based not only on one singular act, but on a continuum of events. *See Mills v. Commonwealth,* 44 S.W.3d 366, 371 (Ky.2001) ("Thus, complicity liability often will not depend on a particular act, but on many different acts that occur at different points in time. Moreover, it may well be that it is only the accumulation of acts that serves to prove complicity. In other words, no particular act in and of itself would serve as the defining act ..."). At trial, evidence was introduced that Burton assisted Appellant in either carrying or making Currin enter the bedroom where she was murdered. Caldwell testified that Burton and Tamara Caldwell were present when Appellant strangled Currin with his belt and that Burton and Tamara Caldwell participated in many of the acts which Appellant instructed them to do. Testimony also indicated that Appellant told several people after the crime that he did not murder Currin, but was present when others killed her. Looking at all the circumstances surrounding Currin's murder, the evidence supports a conclusion that Burton and Tamara Caldwell were part of the continuum of events that led to her death. *Id.* There is no unanimity problem with the murder jury instruction.

Second, there was sufficient evidence presented that Burton and/or Caldwell engaged in first-degree sodomy with Currin. At trial, Stubblefield testified that she saw Appellant and Burton have sex with Currin while she was "unconscious." Tamara Caldwell was present in the room during this time. Caldwell testified that Tamara Caldwell assisted Burton by holding down Currin's legs so she could not move while he had sex with her. Additionally, Tamara Caldwell and Burton were present in the bedroom when Appellant masturbated on Currin. Since the jury was instructed on complicity, a jury could have reasonably found that Burton and/or Caldwell participated in or committed deviate sexual acts involving Currin. There is no unanimity problem with the first-degree sodomy instruction.

Third, there was sufficient evidence presented that Appellant raped Currin. Stubblefield testified that Appellant engaged in sex with Currin at a time when she was unsure whether Currin was dead or unconscious. Additionally, Appellant bragged to his friend Timothy Carr that he had sex with Currin on the night she was murdered. This testimony, along with the events surrounding the night of Currin's murder are enough to support Appellant's conviction for first-degree rape.

Further, it is clear that the jury could have found Appellant complicit in all of these crimes by his actions in forcibly bringing Currin to the bedroom where she was raped, sodomized, and murdered. His complicity was further demonstrated by the testimony that Appellant rendered Currin helpless on two occasions by hitting her on the head, enabling Burton and Tamara Caldwell to commit crimes against her. There are no evidentiary or unanimity problems with the jury instructions provided.

### C. The jury instructions on accomplice liability and complicity were understandable

Finally, Appellant argues that the jury instructions which allowed the jurors to return a verdict against him on the basis of accomplice liability were improper. Appellant argues that the term "complicity" was defined for the jurors, but that the jurors were never told how to apply that definition. The "complicity" instruction stated:

> [c]omplicity means that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he solicits, commands, or engages in a conspiracy with such other person to commit the offense, or aids, counsels, or attempts to aid such person in planning or committing the offense.

Appellant argues that this instruction, coupled with the instruction for first-degree rape, was incomprehensible for a jury to understand. However, the complicity definition mirrors the example provided in 1 Cooper, *Kentucky Instructions To Juries*

46

> (Criminal), § 10.01 (5th ed.2006). We find this definition to be
> concise and clearly understandable by jurors of ordinary
> intelligence. Further, Appellant presents no evidence that the jury
> did not or could not understand the instruction or how to apply it in
> conjunction with the rape instruction. There is no error here.

*Cross v. Commonwealth*, 2009 WL 4251649, *5-8 (Ky. 2009) (2008-SC-000465) (footnote

omitted).

In any event, the United States Supreme Court has stated, "Plainly there is no general

requirement that the jury reach agreement on the preliminary factual issues which underlie the

verdict." *McKoy v. North Carolina,* 494 U.S. 433, 449 (1990) (BLACKMUN, J., concurring)

(footnotes omitted)." *Schad v. Arizona*, 501 U.S. 624, 632 (1991).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application

of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue

otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-

103 (2011).

Any ruling by this court that clearly existing United States Supreme Court precedent was

violated would create a new rule of law and would be barred by the non-retroactivity doctrine in

*Teague v. Lane*, 489 U.S. 288 (1989).

In any event, the alleged error complained of did not have "substantial and injurious

effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S.

47

619 (1993). See *California v. Roy*, 519 U.S. 2(1996); *Hedgepeth v. Pulido*, 555 U.S. 57 (2008),

permitting harmless error review regarding errors in jury instructions.

### HABEAS GROUND III

**CROSS'S CLAIM THAT HIS DUE PROCESS RIGHTS
WERE VIOLATED WHEN THE TRIAL COURT FAILED
TO DIRECT A VERDICT OF AQUITTAL ON THE
CRIMES OF CAPITAL KIDNAPPING AND FIRST-
DEGREE RAPE BASED ON INSUFFICIENT EVIDENCE
WAS ADDRESSED AND REJECTED BY THE KENTUCKY
SUPREME COURT; THE KENTUCKY SUPREME
COURT'S RULING WAS NOT CONTRARY TO NOR AN
UNREASONABLE APPLICATION OF CLEARLY
ESTABLISHED UNITED STATES SUPREME COURT
PRECEDENT.**

Cross argued in the Kentucky Supreme Court that the Commonwealth failed to present

sufficient evidence to prove that he committed capital kidnapping or first-degree rape; he also

argued that his conduct fell within the Kentucky kidnapping exemption statute.  The Kentucky

Supreme Court found sufficient evidence of both capital kidnapping and first-degree rape.

Cross previously raised this issue in his direct appeal brief in Argument III, on pages 26-

34.  The Commonwealth, discussing the facts and evidence in detail, responded in Argument III

of its direct appeal brief, on pages 34-33, which is hereby incorporated by reference.

The Kentucky Supreme Court, in a unanimous opinion, stated:

> **THE TRIAL COURT CORRECTLY DENIED APPELLANT'S DIRECTED VERDICT ON THE CRIMES OF CAPITAL KIDNAPPING AND FIRST-DEGREE RAPE**

Appellant next argues that the trial court erred in denying his motion for a directed verdict of acquittal on the charges of capital kidnapping and first-degree rape. "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). We will address Appellant's arguments regarding capital kidnapping and first-degree rape separately.

> **A. Appellant was not entitled to a directed verdict because his conduct did not fall within the kidnapping exception statute, KRS 509.050.**

Appellant argues that the evidence presented at trial did not support a conviction for capital kidnapping, but instead falls within the kidnapping exception statute, KRS 509.050. A three-part test was developed in *Griffin v. Commonwealth,* 576 S.W.2d 514, 516 (Ky.1978), to determine if the kidnapping exemption applies to a particular defendant. That test is: 1) whether defendant's criminal purpose was the commission of a criminal offense defined outside of KRS Chapter 509; 2) whether the interference with the victim's liberty occurred immediately with, and incidental to the commission of the underlying crimes; and 3) whether the interference with the victim's liberty exceeded that which is ordinarily incident to the commission of the underlying crimes. *Id.* In support of his argument, Appellant states that, according to the Commonwealth's case, his criminal purpose in this case was to murder and assault Currin, crimes which are outside of KRS Chapter 509. Appellant also argues that any interference with Currin's liberty was incidental to the commission of the murder and assault, and that the time Currin was restrained was no greater than what was necessary to commit the underlying criminal acts. The

49

evidence presented at trial however, supports the denial of Appellant's directed verdict of acquittal motion.

Testimony indicated that while Currin voluntarily got into the car with Appellant, she only did so to receive a ride home. Instead of going to her house though, there was testimony that Appellant took her to one house, to change cars, then eventually to Burton's house, which she was in some manner physically forced to enter against her will. Detaining her during the time taken to travel from one house to the other exceeded the time needed to murder and rape Currin. The facts as they are leave considerable doubt as to whether the *Griffin* test for applying the exemption was satisfied. As such, the trial court correctly denied Appellant's motion for a directed verdict of acquittal on the kidnapping charge.

### B. Adequate evidence was presented that Appellant committed first-degree rape.

Appellant next argues that the trial court should have granted him a directed verdict of acquittal on the first-degree rape charge because he does not believe that the Commonwealth proved that Currin was alive when he had sexual intercourse with her. However, a review of the record refutes this argument.

Stubblefield testified that upon entering the bedroom at Burton's house where Appellant and Currin were located, she saw Currin with a belt around her neck being held by Appellant. Stubblefield stated that she was unsure if Currin was deceased at this time. Stubblefield then testified that Appellant had sex with Currin. Additionally, Appellant told his friend Timothy Carr that he did in fact have sex with Currin on the night she was murdered. The facts surrounding Appellant's behavior toward Currin support a conclusion that his admitted sexual intercourse with her was not consensual. Moreover, the evidence amply supported a conviction under the rape charge as an accomplice to Burton's sexual intercourse with Currin at a time she was undeniably alive. Thus, reviewing all of the evidence, it would not be unreasonable for a juror to find Appellant guilty of first-degree rape. Looking at the facts in a light favorable to the Commonwealth, the trial judge

50

> correctly denied Appellant's motion for a directed verdict of
> acquittal. *Benham,* 816 S.W.2d at 187.

*Cross v. Commonwealth*, 2009 WL 4251649, *8-9 (Ky. 2009) (2008-SC-000465).

The United States Supreme Court has stated the following in regard to sufficiency of the

evidence:

> Instead, the relevant question is whether, after viewing the
> evidence in the light most favorable to the prosecution, *any* rational
> trier of fact could have found the essential elements of the crime
> beyond a reasonable doubt. See *Johnson v. Louisiana,* 406 U.S.,
> [356] at 362 [1972]. This familiar standard gives full play to the
> responsibility of the trier of fact fairly to resolve conflicts in the
> testimony, to weigh the evidence, and to draw reasonable
> inferences from basic facts to ultimate facts. Once a defendant has
> been found guilty of the crime charged, the factfinder's role as
> weigher of the evidence is preserved through a legal conclusion
> that upon judicial review *all of the evidence* is to be considered in
> the light most favorable to the prosecution.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (footnote omitted) (bracketed material added).

To the extent Cross's claim involves a claim regarding application of the state kidnap

exemption, as pointed out in Habeas Ground I above, a state court's interpretation of state law is

binding on federal habeas corpus courts.

The Kentucky Supreme Court's findings of fact were based on the trial evidence.

"Findings of fact made by a state court are presumed correct and can be contravened only where

the habeas petitioner shows by clear and convincing evidence that the state court's factual

findings were erroneous. This presumption of correctness also applies to the factual findings of a

state appellate court based on the state trial record." (Citations and quotation marks omitted.)

51

*Bugh v. Mitchell*, 329 F.3d 496, 500-501 (6th Cir. 2003).  *See also Holland v. Jackson*, 542 U.S. 649 (2004).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-103 (2011).

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

In any event, the alleged error complained of did not have "substantial and injurious effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

### HABEAS GROUND IV

**CROSS'S CLAIM THAT HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL COURT REFUSED TO DECLARE A MISTRIAL DUE TO THE PRESENCE OF A BIBLE IN THE JURY DELIBERATION ROOM WAS RAISED AND IMPLICITLY REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that his Sixth, Eighth, and Fourteenth Amendment rights were violated when the jurors allegedly consulted a "pocket" Bible during the penalty phase deliberations and he argued the trial court abused its discretion when it denied a motion for a mistrial based on the Bible's presence in the jury room.

Cross previously raised this issue in his direct appeal brief in Argument IV, on pages 34-37. The Commonwealth, discussing the facts and evidence in detail, responded in Argument IV of its direct appeal brief, on pages 38-40, which is hereby incorporated by reference. The Commonwealth noted there was no evidence that any of the jurors had actually consulted the "pocket" Bible during the 10 or 15 minutes it was present in the room. Furthermore, the trial court admonished the jury that the only things to be considered were the exhibits and evidence which that were presented at trial.

53

The Kentucky Supreme Court, in a unanimous opinion, stated:

> ### APPELLANT WAS NOT ENTITLED TO A MISTRIAL AND NEW PENALTY PHASE DUE TO THE PRESENCE OF A BIBLE IN THE JURY ROOM

Appellant next argues that he was entitled to a mistrial and a new penalty phase due to the presence of a "pocket Bible" in the jury room. After the jury had deliberated for seven and a half hours during the penalty phase of trial, the Bailiff informed the trial judge that one of the jurors had a "pocket Bible" and that the jurors had asked for the Bible located on the bench. Appellant immediately moved for a mistrial and insisted that the "pocket Bible" be removed from the jury room, presumably because of the concern that the jury was considering materials outside of the evidence presented in trial. The Commonwealth agreed that the "pocket Bible" should be removed from the jury room. The trial judge then had the jurors return to the courtroom, where the "pocket Bible" was confiscated. The trial judge provided the following admonishment:

> Ladies and gentlemen of the jury, I've been advised that there was a Bible in the jury room. You may have had one with you. I will admonish you that the only things that you are to consider are the exhibits and the evidence that's been presented. The Bible, although useful in some situations, is not to be considered with the same weight as evidence presented in this trial. And, you can continue with your deliberations. Thank you. If you'd return to the jury room.

Appellant did not object to the trial court's admonition, but again moved for a mistrial after the jurors returned to the jury room. The trial judge determined, based on the information before him that the jurors had not been influenced by the presence of the "pocket Bible," and he therefore denied the motion for a mistrial. Twenty minutes later, the jury returned a verdict of life imprisonment without benefit of probation or parole instead of the death penalty.

54

> Appellant now argues that the admonishment failed to cure any error that occurred due to the presence of the "pocket Bible" in the jury room and that he should have been granted a mistrial and new penalty phase. We disagree.
>
> A mistrial "is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity." *Bray v. Commonwealth,* 177 S.W.3d 741, 752 (Ky.2005). The trial court's denial of a motion for a mistrial will be reviewed for abuse of discretion. *Id.* In this matter, there was no such manifest necessity. In dealing with the presence of outside materials in the jury room, a curative instruction telling the jury to consider only the evidence presented in trial frequently addresses the error. *United States v. Lara-Ramirez,* 519 F.3d 76, 87 (1st Cir.2008) (explaining that in situations where outside evidence (such as the Bible) is potentially being considered by a jury, a curative instruction can "eradicate" the risk of prejudice). A mistrial is only an appropriate remedy when the trial judge believes that the jury's exposure to outside evidence is too great to repair by admonishment. *Id.* at 82. While the admonishment was not perfect, we believe it had the effected intent, to make sure the jury knew that the Bible was not to be considered as evidence in the case. A mistrial was unwarranted and Appellant is not entitled to a new penalty phase proceeding.

*Cross v. Commonwealth*, 2009 WL 4251649, *9-10 (Ky. 2009) (2008-SC-000465) (footnote omitted).

As noted in the Commonwealth's responsive direct appeal brief, in footnote 28 on page 40, there is no United States Supreme Court authority on biblical references in the jury room and there is no consensus among the circuits as to whether the Bible or its teachings are an internal or external influence when read or discussed by jurors during deliberations. *Franklin v. Bradshaw*, 2009 WL 649581 (S.D. Ohio 2009), at page 86.

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-103 (2011).

Although the Kentucky Supreme Court did not mention the alleged federal constitutional violations in rejecting the claim, those claims were implicitly rejected. In *Johnson v. Williams*, 133 S.Ct. 1088, 1094 (2013), the United States Supreme Court recently noted that, "... it is not the uniform practice of busy state courts to discuss separately every single claim to which the defendant makes even a passing reference." The Court further noted that "... a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim. Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development." *Id*. at 1095. In addition, "... there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion." *Id*. The Court noted that when a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits, noting that that presumption could sometimes, in limited circumstances, be rebutted. *Id*. 1096.

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

In any event, the alleged error complained of did not have "substantial and injurious effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

### HABEAS GROUND V

**CROSS'S CLAIMS THAT THE DEATH PENALTY IS A DISPROPORTIONAL PUNISHMENT FOR THE CRIME OF CAPITAL KIDNAPPING AND THAT THE KENTUCKY CAPITAL KIDNAPPING STATUTE IS UNCONSTITUTIONAL WAS ADDRESSED AND REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that the death penalty is a disproportional punishment for the crime of capital kidnapping and that his sentence [of life without parole] for capital kidnapping violates the Eight Amendment.  Cross lacks standing to complain about a sentence that he did not receive. *Houston v. Roe*, 177 F.3d 901, 907 (9th Cir.1999).

Cross previously raised this issue in the Kentucky Supreme Court in his direct appeal brief in Argument V, on pages 38-42.  The Commonwealth, responded in Argument V of its direct appeal brief, on pages 41-43, which is hereby incorporated by reference. The

57

Commonwealth discussed *Kennedy v. Louisiana,* 554 U.S. 407 (2008), which Cross had relied

upon, and noted that *Kennedy* was not applicable to Cross's case because the facts in *Kennedy*

were distinguishable given the kidnap victim in that case was released alive, whereas Jessica

Currin was not. Cross's sentence of life without parole for the kidnapping of Jessica Currin, with

intentional murder as an aggravating circumstance, is not unconstitutional.  See *Harmelin v.*

*Michigan*, 501 U.S. 957 (1991), finding life in prison without the possibility of parole for

possession of more than 650 grams of cocaine, was not unconstitutional; therefore, Cross's

sentence of life without the possibility of parole cannot be unconstitutional for the capital

kidnapping and murder of Jessica Currin.

   The Kentucky Supreme Court, in a unanimous opinion, stated:

> ### THE DEATH PENALTY IS NOT A DISPROPORTIONAL PUNISHMENT FOR THE CRIME OF CAPITAL KIDNAPPING AND THE CAPITAL KIDNAPPING STATUTE IS CONSTITUTIONAL
>
> Appellant next argues that the capital kidnapping statute, KRS 509.040(2), is rendered unconstitutional by the recent United States Supreme Court opinion, *Kennedy v. Louisiana,* --- U.S. ----, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008). Appellant argues that *Kennedy* holds the death penalty is only constitutional when given to defendants who commit crimes involving the intentional murder of a victim. Appellant quotes the phrase "we conclude that, in determining whether the death penalty is excessive, there is a distinction between intentional first-degree murder on the one hand and non-homicide crimes against individual persons, even including child rape, on the other" from *Kennedy* and insist that the case prohibits the death penalty as a punishment for crimes leading to non-intentional death. *Id.* at 2660. Thus, Appellant argues that our interpretation of KRS 509.040(2) in *St. Clair v. Roark,* 10

S.W.3d 482 (Ky.2000) is unconstitutional because in that case we held that the capital kidnapping statute applies whenever a kidnapping leads to the death of the victim regardless of the defendant's mental state. *Id.* at 486-487.

Appellant misconstrues *Kennedy's* holding. *Kennedy* dealt with the constitutionality of a Louisiana statute which rendered a defendant death penalty eligible for a child rape conviction, in which the victim was not killed. 128 S.Ct. at 2647. *Kennedy* does not affect the constitutionality of applying the death penalty to crimes which led to the death of the victim, such as capital kidnapping. In fact, *Kennedy* states: "[d]ifficulties in administering the [death] penalty to ensure against its arbitrary and capricious application require adherence to a rule reserving its use, at this stage of evolving standards and in cases of crimes against individuals, for crimes that take the life of the victim." *Id.* at 2665. Thus, we find *Kennedy* has no bearing on our interpretation of the capital kidnapping statute, KRS 509.040(2), and our holding in *St. Clair* is not unconstitutional.

*Cross v. Commonwealth*, 2009 WL 4251649, *10-11 (Ky. 2009) (2008-SC-000465).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-103 (2011).

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

59

To the extent Cross's claim, involves a claim regarding the state court's interpretation of the kidnapping statute, as pointed out in Habeas Ground I above, a state court's interpretation of state law is binding on federal habeas corpus courts.

In any event, the alleged error complained of did not have "substantial and injurious effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

### HABEAS GROUND VI

**CROSS'S CLAIMS THAT HIS CONVICTIONS FOR BOTH CAPITAL KIDNAPPING AND CAPITAL MURDER VIOLATE DOUBLE JEOPARDY WERE ADDRESSED AND REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that his judgment, which reflects convictions for both capital kidnapping and capital murder, violates his state and federal constitutional rights to be free from double jeopardy.

Cross previously raised this issue in his direct appeal brief in Argument VI, on pages 42-46. The Commonwealth, responded in Argument VI of its direct appeal brief, on pages 43-48, which is hereby incorporated by reference. The Commonwealth pointed out that Cross's claim that *St. Clair v. Roark*, 10 S.W.3d 482 (Ky. 2000), does not survive the United States Supreme Court ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) is not supported by United States

60

Supreme Court precedent.  Contrary to Cross's argument, murder is not a lesser-included offense of capital kidnapping and there is no double jeopardy violation.  In fact, his argument is premised on incorrect readings of both *Kennedy v. Louisiana*, 128 S.Ct. 2641 (2008) and *Apprendi*, *supra*, and is further premised on a pre-supposed re-write of the capital kidnapping statute.

The Kentucky Supreme Court, in a unanimous opinion, stated:

> ### APPELLANT'S CONVICTIONS FOR BOTH CAPITAL KIDNAPPING AND CAPITAL MURDER DO NOT VIOLATE DOUBLE JEOPARDY
>
> Appellant next argues that his convictions for capital kidnapping and capital murder violate double jeopardy. Appellant tenders three arguments, each of which will be dealt with separately: A) that our ruling in *St. Clair* [*v. Roark*], 10 S.W.3d 482 [(Ky. 2008)], was erroneous; B) that *St. Clair* does not survive *Apprendi v. New Jersey,* 530 U.S. 266 (2000); and C) that murder is a lesser-included offense of capital kidnapping.
>
> #### A. Our opinion in St. Clair is not erroneous and reflects the current statutory scheme
> Appellant first argues that *St. Clair* is based on a legal impossibility and is thus erroneous. *St. Clair* holds that the offenses of murder and capital kidnapping do not merge during the guilt phase because the capital kidnapping statute, KRS 509.040(2), is only implicated when the kidnapping leads in someway to the victim's *death,* while murder "contains an element, i.e. either intent to kill or aggravated wantonness, which is not required to enhance kidnapping from a Class A felony to a capital offense." *St. Clair,* 10 S.W.3d at 486. We also found that the two offenses do not merge at the penalty phase because it is not "double jeopardy to impose a separate penalty for one offense while using the same offense as an aggravating circumstance authorizing imposition of capital punishment for another offense." *Id.* at 487 (*citing Witte v. United States,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)). Appellant argues that *St. Clair* is

61

based on a legal impossibility because it assumes a jury could find that a defendant's actions in kidnapping a victim led to the *accidental* death of that victim, but then also find that the defendant *intentionally* murdered the same victim. He argues that a jury could not find that the defendant killed both accidentally and intentionally.

Appellant, however, misreads *St. Clair. St. Clair* stands for the proposition that it is the *death* of the kidnapping victim that makes kidnapping a capital offense. *St. Clair,* 10 S.W.3d at 486. The jury is not required to determine the defendant's mental state to find him guilty of capital kidnapping, only that the victim died as a result of the kidnapping. *See* KRS 509.040(2). The defendant's intent or mental state is only determined when the jury determines whether the defendant murdered the victim. Murder then can be used as an aggravating circumstance which allows the imposition of the death penalty. KRS 532.025(2)(a)(2). Thus, there is no legal impossibility and we believe that *St. Clair* comports with the statutory scheme enacted by the legislature.

**B. *Apprendi* does not render the logic used in *St. Clair* invalid.**
Appellant next argues that the United States Supreme Court opinion in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), invalidates the logic used in *St. Clair.* *Apprendi* states that any fact which increases the range of possible punishments is "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." *Apprendi,* 530 U.S. at 494, fn. 1, 9. Appellant uses this language to argue that since murder is a death penalty aggravator for kidnapping, it is actually an element of capital kidnapping. Appellant thus believes that *St. Clair* is invalid since it holds that capital kidnapping and murder do not merge. *St. Clair,* 10 S.W.3d at 486-487. We disagree with Appellant's argument.

*Apprendi* only stands for the proposition that circumstances which enhance a penalty must be found beyond a reasonable doubt to a jury, not by a preponderance of the evidence and not just to a judge. 530 U.S. at 495 (citing *McMillan v. Pennsylvania,* 477 U.S.

79, 88, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986)) ("When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.' ") Notably, *Apprendi* does not overrule prior cases which held that murder could be used as a circumstance to elevate a punishment to the death penalty. *See United States v. Booker,* 543 U.S. 220, 240, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (holding that *Witte,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351, is good case law post-*Apprendi* ). Additionally, in a post-*Apprendi* case, we reaffirmed our support for *St. Clair. Jacobs v. Commonwealth,* 58 S.W.3d 435, 438 (Ky.2001). *Apprendi* does not overrule nor affect our ruling in *St. Clair .*

### C. Intentional murder is not a lesser-included offense of Capital Kidnapping

Appellant finally argues that based on his novel interpretation of the capital kidnapping statute to include murder as a required element of capital kidnapping, murder becomes a lesser-included offense of capital kidnapping. However, we again decline to accept Appellant's interpretation of the capital kidnapping statute. We stand by *St. Clair* for the proposition that capital kidnapping is committed when the death of the victim occurs as a result of the kidnapping, and that murder can be used as a death penalty aggravator.

*Cross v. Commonwealth*, 2009 WL 4251649, *11-12 (Ky. 2009) (2008-SC-000465) (bracketed citation added).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law

63

beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-103 (2011).

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

In any event, the alleged error complained of did not have "substantial and injurious effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

## HABEAS GROUND VII

**CROSS'S CLAIMS THAT HIS EIGHTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE JURY WAS ALLOWED TO CONSIDER AN INVALID AGGRAVATING CIRCUMSTANCE WAS ADDRESSED AND REJECTED BY THE KENTUCKY SUPREME COURT; THE KENTUCKY SUPREME COURT'S RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Supreme Court that his Eighth Amendment rights were violated because the jury was allowed to consider murder as an aggravator for capital kidnapping; he premised his argument on the claim that murder is an invalid aggravating circumstance for kidnapping. Contrary to Cross's claim, Jessica's murder was not used to enhance the kidnapping to a capital offense and, again, as an aggravating circumstance qualifying the death penalty as a valid penalty. The fact that Jessica was not released alive enhanced

kidnapping to a capital offense.  The fact that she was intentionally murdered aggravated the

capital kidnapping to allow imposition of the death penalty.

Cross previously raised this issue in his direct appeal brief in Argument VII, on pages 46-

49.  The Commonwealth, responded in Argument VII of its direct appeal brief, on pages 48-50,

which is hereby incorporated by reference.

The Kentucky Supreme Court, in a unanimous opinion, stated:

> *APPELLANT'S EIGHTH AMENDMENT RIGHTS WERE*
> *NOT VIOLATED BY THE JURY'S CONSIDERATION OF*
> *MURDER AS AN AGGRAVATOR FOR CAPITAL*
> *KIDNAPPING*
>
> Appellant finally argues that because of *Kennedy* [*v. Louisiana*,
> 554 U.S. 407 (2008)] and his interpretation of the capital
> kidnapping statute which requires murder to be an element of
> capital kidnapping, the guilty verdict Appellant received for
> murder could not be used as a death penalty aggravator for
> kidnapping. Appellant thus argues that during his trial, murder was
> improperly used twice: once as an element of capital kidnapping,
> and again as a death penalty aggravator for kidnapping. Appellant
> believes he is entitled to a new penalty phase since he contends he
> was ineligible for the death penalty.
>
> However, as previously stated, *Kennedy* does not stand for the
> proposition that kidnapping can only be raised to a capital offense
> if the defendant intentionally killed the victim. Further, as the
> statutory scheme indicates and our holding in *St. Clair* [*v. Roark*,
> 10 S.W.3d 482 (Ky. 2008)] affirms, it is the death of the victim
> which raises kidnapping to a capital offense. 10 S.W.3d at 486.
> Thus, murder is an appropriate aggravator, and the jury could
> consider the death penalty in the range of penalties for Appellant's
> crimes. Even if we were to agree that murder was not an
> appropriate aggravator, the jury found Appellant guilty of first
> degree rape and first-degree sodomy, both of which could have

65

been used to aggravate the kidnapping to a capital offense. KRS
532.025(2)(a)(2). Appellant's Eighth Amendment rights were not
violated.

*Cross v. Commonwealth*, 2009 WL 4251649, \*12-13 (Ky. 2009) (2008-SC-000465) (bracketed

citations added).

The Kentucky Supreme Court's ruling was not contrary to or an unreasonable application

of clearly established then-existing United States Supreme Court precedent. Cross doesn't argue

otherwise. Cross fails to show that the Kentucky Supreme Court's ruling on this claim was so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. 86, at 101-

103 (2011).

Any ruling by this court that clearly existing United States Supreme Court precedent was

violated would create a new rule of law and would be barred by the non-retroactivity doctrine in

*Teague v. Lane*, 489 U.S. 288 (1989).

In any event, the alleged error complained of did not have "substantial and injurious

effect on the jury's verdict," as required for habeas relief under *Brecht v. Abrahamson*, 507 U.S.

619 (1993).

66

## HABEAS GROUND VIII

**CROSS'S CLAIM THAT TRIAL DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILURE TO "ADEQUATELY" PRESENT AN ALTERNATIVE PERPETRATOR DEFENSE IS PROCEDURALY DEFAULTED; CROSS'S CLAIM THAT TRIAL DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILURE TO PRESENT AN ALTERNATIVE PERPETRATOR DEFENSE WAS ADDRESSED AND REJECTED BY THE KENTUCKY COURT OF APPEALS; THE KENTUCKY COURT OF APPEALS RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued in the Kentucky Court of Appeals that "[t]rial counsel failed to present evidence of the alternative perpetrator. . . ."[17] The Kentucky Court of Appeals found that trial defense counsel did present evidence of alternate perpetrators and that Cross had not argued "that the manner in which his trial attorneys presented this evidence was deficient." Cross has now morphed his claim to argue, "[t]he evidence and the manner in which trial counsel presented the evidence was deficient when presenting the alterative perpetrator defense at trial." No facts support this claim. To the extent that Cross has morphed his claim, that claim is procedurally defaulted because it was not presented to the Kentucky Court of Appeals.

Cross previously argued in the Kentucky Court of Appeals that trial counsel failed to present evidence of an alternative perpetrator; he raised this issue in his collateral attack appeal

---

[17] While the argument heading of Cross's Argument VI, in his collateral attack appeal brief, stated trial defense had failed to "adequately" present the defense, his argument was based on his claim that trial defense counsel had failed to present the alternate perpetrator defense in any manner.

brief in Argument VI, on pages 21-22. The Commonwealth responded in Argument VI of its

collateral attack appeal brief, on pages 24-25, which is hereby incorporated by reference.

The Kentucky Court of Appeals, in a unanimous opinion, stated:

> The next basis of Cross's appeal is his contention that his trial
> counsel failed to investigate and present the possibility that other
> perpetrators had committed the crimes of which Cross was
> accused. But for this deficiency, he argues, the jury would not have
> found him guilty.
>
> Trial counsel argued to the jury that the crimes were committed by
> two alternative perpetrators, namely Jeremy Adams and Carlos
> Saxton, the two individuals who had previously been charged with
> the murder. It was the defense's position that investigators had
> "gotten it right the first time" when they indicted Adams and
> Saxton, and trial counsel elicited testimony that witnesses had
> previously identified the two as the perpetrators. Cross's trial
> attorneys also produced evidence that on the night of the crime,
> Saxton had been wearing the same kind of belt which had
> purportedly been used to strangle Jessica.
>
> Cross's representation that his trial counsel failed to present
> evidence of these alternative perpetrators is false. He has not
> argued that the manner in which his trial attorneys presented this
> evidence was deficient. Cross has not demonstrated that his trial
> counsel was deficient in this respect.

*Cross v. Commonwealth*, 2014 WL 505575, *5 (Ky. App. 2014) (2011-CA-002136).

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466

U.S. 668 (1984). A convicted defendant claiming ineffective assistance of counsel bears the

burden of (1) identifying specific errors by counsel, (2) demonstrating that counsel's errors were

objectively unreasonable under the circumstances existing at the time of trial, (3) rebutting the

strong presumption that counsel's actions were the result of trial strategy, and (4) demonstrating that counsel's unreasonable errors prejudiced his right to a fair trial to the extent that there is a reasonable probability of a different verdict. *Strickland v. Washington*, 466 U.S. at 687-694.

Because Cross has the burden to overcome the presumption that trial defense counsel performed reasonably, "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 134 S.Ct. 10, 17 (2013), citing *Strickland*, 466 U.S. at 689.

A court reviewing a claim of ineffective assistance of counsel "is required not simply to "give [the] attorneys the benefit of the doubt," but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did." [Internal citations omitted.] *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.… *Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." [Internal quotation marks and citations omitted and footnote added.] *Harrington v. Richter*, 562 U.S. 86, 110 (2011),

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

69

the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *** There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689-90 (citations omitted).

*Harrington v. Richter*, 562 U.S. 86, 101 (2011), instructs, "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision. *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). *** Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. *** If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 101-102.

The Kentucky Court of Appeals reviewed the trial evidence and found that trial defense counsel did present evidence of an alternative perpetrator defense. As stated above, findings of fact made by a state court are presumed correct and can be contravened only where the habeas petitioner shows by clear and convincing evidence that the state court's factual findings were erroneous. The jury simply didn't believe the alternative perpetrator defense given the overwhelming evidence of Cross's guilt, including not only eye witness testimony to the rape and murder, but Cross's own admissions, to more than one person, that he had sex with the victim on the night she was murdered and that he murdered the victim. He even specifically admitted he murdered "a girl" with a belt. Furthermore, Victoria Caldwell testified she had made statements that caused Jeremy Adams and Carlos Saxton to be charged with murder in spite of the fact that it was not true.  See the Attorney General's statement of Trial Evidence, this memorandum. The Kentucky Court of Appeals found, "Cross was convicted on the strength of the Commonwealth's evidence and not due to ineffective assistance of trial counsel." *Cross v. Commonwealth*, 2014 WL 505575, *5 (Ky. App. 2014) (2011-CA-002136). Cross fails to show that the state court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. at 101-103. Also see, *Cullen v. Pinholster*, 563 U.S. 170, 180-182 and 189-190 (2011). The ruling of the Kentucky Court of Appeals was not contrary to nor an unreasonable application of clearly established United States Supreme Court precedent.

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

### HABEAS GROUND IX

**CROSS'S CLAIM THAT TRIAL DEFENSE COUNSEL FAILED TO SUBJECT THE PROSECUTION'S CASE TO MEANINGFUL ADVERSARIAL TESTING WAS ADDRESSED AND REJECTED BY THE KENTUCKY COURT OF APPEALS; THE KENTUCKY COURT OF APPEALS RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

While Cross's argument heading (in Argument II), in the Kentucky Court of Appeals, stated that trial defense counsel "failed to subject the Commonwealth's case to prove every element of the offense beyond a reasonable doubt," Cross actually argued that the Commonwealth failed to prove the cause of Jessica Currin's death, failed to prove that he killed Jessica, and failed to prove that Jessica was kidnapped and raped. The Commonwealth, referring to the trial evidence, argued that each of Cross's claims were refuted by the record and pointed out that the claims of insufficiency had been raised and rejected on direct appeal. Cross now morphs his claim to include allegations that the Commonwealth also failed to prove every element of first-degree sodomy, abuse of a corpse, and tampering with physical evidence. To the extent that Cross has morphed his claim, those additional claims are procedurally defaulted because they were not presented to the Kentucky Court of Appeals.

72

Cross's argument in the Kentucky Court of Appeals was raised in his collateral attack appeal brief in Argument II, on pages 9-12.  The Commonwealth responded in Argument II of its collateral attack appeal brief, on pages 20-22, which is hereby incorporated by reference.

The Kentucky Court of Appeals, in a unanimous opinion, addressed the issue from the perspective of ineffective assistance of counsel for failure to subject the prosecution's case to meaningful adversarial testing; it appears the Kentucky Court of Appeals addressed the claims in regard to a passing reference Cross made, on page 11 of his *pro se* collateral attack brief, in regard to *United States v. Cronic,* 466 U.S. 648, 659 (1984). Regardless of how the claim is construed, the claim is meritless.  The Kentucky Court of Appeals stated:

> Cross alleges his trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing[.]" *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984). If he is correct, we must presume he suffered prejudice. *Id.*
>
> The Sixth Amendment of the United States Constitution ensures a defendant's right to have his trial attorneys "require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.* at 657. But, "absent some effect of [the] challenged conduct [of trial counsel] on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *Id.* at 658.
>
> Our review of the record reveals that the Commonwealth's case was subjected to rigorous testing. Cross's trial attorneys called more than a dozen witnesses on his behalf, two of whom were expert witnesses, one in forensic pathology and one in forensic document examination. The witnesses testified as to the veracity of the Commonwealth's witnesses, police treatment of witnesses

73

which may have influenced their testimony, the factual accuracy
of the Commonwealth's evidence, and the cause of Jessica's death.

Cross's trial counsel also raised objections during trial and
thoroughly and appropriately cross-examined the
Commonwealth's witnesses. Trial attorneys raised a motion to
dismiss on the basis of alleged discovery violations and moved for
a directed verdict. They observed potential problems with jurors
during trial and acted to ensure they did not negatively affect their
client. Throughout the trial, they forcefully advocated on Cross's
behalf.

Cross has not alleged that his representation was impacted by any
of the factors addressed in *Cronic,* and our review of the record
gives us no reason to believe his trial counsel was inexperienced
or unprepared for the number of charges or the complexity of the
defenses. Cross, in terms of his rights under the Sixth
Amendment, benefited by a rigorous adversarial testing of the
Commonwealth's case, and he is not entitled to relief on this basis.

*Cross v. Commonwealth*, 2014 WL 505575, *3 (Ky. App. 2014) (2011-CA-002136) (footnotes

omitted).

The Kentucky Court of Appeals reviewed the trial record and found that trial defense

counsel "forcefully advocated on Cross's behalf." As stated above, findings of fact made by a

state court are presumed correct and can be contravened only where the habeas petitioner shows

by clear and convincing evidence that the state court's factual findings were erroneous. Cross

fails to show that the state court's ruling on this claim was so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement. *Harrington v. Richter*, 562 U.S. at 101-103. Also see, *Cullen v.*

*Pinholster*, 563 U.S. 170, 180-182 and 189-190 (2011). The ruling of the Kentucky Court of

74

Appeals was not contrary to nor an unreasonable application of clearly established United States Supreme Court precedent.

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

### HABEAS GROUND X

**CROSS'S CLAIM THAT TRIAL DEFENSE COUNSEL FAILED TO INVESTIGATE WAS ADDRESSED AND REJECTED BY THE KENTUCKY COURT OF APPEALS; THE KENTUCKY COURT OF APPEALS RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued, in the Kentucky Court of Appeals, that trial defense counsel failed to investigate certain witnesses, in particular, the two key fact witnesses, Victoria Caldwell and Vinisha Stubblefield. He also mentioned Jeremy Adams, and Carlos Saxton in passing. The record refutes his claims and reveals that each was investigated.

Cross previously raised this argument in the Kentucky Court of Appeals in his collateral attack appeal brief in Argument IV, on pages 14-17. The Commonwealth responded, in detail, regarding Victoria Caldwell and Vinisha Stubblefield in Argument IV of its collateral attack appeal brief, on pages 22-23, which is hereby incorporated by reference. The Commonwealth responded regarding Jeremy Adams and Carlos Saxton in Argument VI of its collateral attack

appeal brief, on pages 24-25, which is hereby incorporated by reference, regarding the fact that they were investigated as alternative perpetrators. The Kentucky Court of Appeals discussed Jeremy and Carlos and the fact that trial defense counsel did investigate them and presented an alternate perpetrator defense. See Habeas Ground VIII, this memorandum, discussing the court's findings.

The Kentucky Court of Appeals, in a unanimous opinion, addressed the issue regarding the alleged failure to investigate Victoria and Vinisha and stated:

> Cross next claims his trial counsel failed to investigate and discover that two key witnesses for the Commonwealth, Vinisha Stubblefield and Victoria Caldwell, had told many lies to investigators prior to trial. Had the trial attorneys investigated and discovered the witnesses' inconsistent stories and propensity for lying, claims Cross, they could have used that information for impeachment.

> Cross is correct that trial counsel has a duty to "investigate and interview promising witnesses[.]" *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992). In this case, the record reflects that his trial attorneys' investigation of Stubblefield and Caldwell did prepare them to impeach the witnesses' testimony.

> Central to the defense's trial strategy was an effort to undermine the credibility of the Commonwealth's two key fact witnesses. The record reflects that defense counsel investigated Stubblefield and Caldwell, discovered they had lied in the past, and repeatedly brought the lies to the jury's attention. Cross's trial counsel impeached both witnesses with prior inconsistent statements they had made to investigators and elicited admissions from both of them that they had told numerous lies prior to trial. Their history of dishonesty was in the record, and doubts about their credibility were placed before jurors.

76

>Cross's allegation that his trial counsel failed to investigate the witnesses' pattern of lying to investigators, therefore, is entirely contradicted by the record. He has not presented evidence that his trial attorney's performance was deficient in this respect.

*Cross v. Commonwealth*, 2014 WL 505575, *4 (Ky. App. 2014) (2011-CA-002136).

As stated above, findings of fact made by a state court are presumed correct and can be contravened only where the habeas petitioner shows by clear and convincing evidence that the state court's factual findings were erroneous. Cross fails to show that the state court's ruling on this claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v. Richter*, 562 U.S. at 101-103. Also see, *Cullen v. Pinholster*, 563 U.S. 170, 180-182 and 189-190 (2011). The ruling of the Kentucky Court of Appeals was not contrary to nor an unreasonable application of clearly established United States Supreme Court precedent.

Any ruling by this court that clearly existing United States Supreme Court precedent was violated would create a new rule of law and would be barred by the non-retroactivity doctrine in *Teague v. Lane*, 489 U.S. 288 (1989).

**HABEAS GROUND XI**

**CROSS'S CLAIM THAT TRIAL DEFENSE COUNSEL FAILED TO OBJECT TO ALLEGED HEARSAY TESTIMONY OF GREG STARKS WAS ADDRESSED AND REJECTED BY THE KENTUCKY COURT OF APPEALS; THE KENTUCKY COURT OF APPEALS RULING WAS NOT CONTRARY TO NOR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED UNITED STATES SUPREME COURT PRECEDENT.**

Cross argued, *inter alia*, in the Kentucky Court of Appeals, that he received ineffective assistance of counsel because trial defense counsel failed to object to alleged hearsay with respect to Greg Starks.[18]  Specifically, Cross complained that Greg Starks testified Cross took his belt off.  Cross misunderstands the meaning of hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  KRE 801(c).  Greg Starks's testimony regarding what Cross may have done with his belt is simply not hearsay.

Cross previously raised this argument in the Kentucky Court of Appeals in his collateral attack appeal brief in Argument III, on pages 12-14.  The Commonwealth responded in Argument III of its collateral attack appeal brief, on page 22, which is hereby incorporated by reference.

The Kentucky Court of Appeals, in a unanimous opinion, addressed the issue and stated:

> Cross generally protests his trial counsel's failure to object to the hearsay testimony of seven of the Commonwealth's witnesses.

---

[18] On habeas review, Cross raises his claim only with regard to Greg Starks.

Specifically, he asserts that witness Greg Starks improperly recounted investigative hearsay to which his trial attorneys failed to object. He does not specify which testimony of the remaining six witnesses was inadmissible hearsay. A defendant's request for RCr 11.42 relief must "state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds." RCr 11.42(2). Because the argument lacks specificity with respect to these six witnesses, we will address only Cross's argument regarding Greg Starks' testimony.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRE 801(c). "Investigative hearsay" refers to:

> [t]he rule ... that a police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information[,] and the taking of that action is an issue in the case. Such information is then admissible, not to prove the facts told to the police officer, but only to prove why the police officer then acted as he did.

*Sanborn v. Commonwealth,* 754 S.W.2d 534, 541 (Ky.1988), *overruled on other grounds by Hudson v. Commonwealth,* 202 S.W.3d 17, 22 (Ky.2006).

Starks' testimony is neither ordinary hearsay nor investigative hearsay. Cross protests that Starks was permitted to testify that he had observed Cross wearing a belt on the evening of the murder and that he took the belt off at some point during the evening. The witness was merely testifying about events he had observed first-hand; first-hand observations are not hearsay. Additionally, Starks was not an investigator and was not working with the police in any way. His testimony could not have been investigative hearsay.

> The performance of Cross's trial counsel was not deficient for
> failing to object to the testimony.

*Cross v. Commonwealth*, 2014 WL 505575, *3-4 (Ky. App. 2014) (2011-CA-002136) (footnote

omitted).

As stated above, findings of fact made by a state court are presumed correct and can be

contravened only where the habeas petitioner shows by clear and convincing evidence that the

state court's factual findings were erroneous. Cross fails to show that the state court's ruling on

this claim was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement. *Harrington v.*

*Richter*, 562 U.S. at 101-103. Also see, *Cullen v. Pinholster*, 563 U.S. 170, 180-182 and 189-190

(2011). The ruling of the Kentucky Court of Appeals was not contrary to nor an unreasonable

application of clearly established United States Supreme Court precedent.

Any ruling by this court that clearly existing United States Supreme Court precedent was

violated would create a new rule of law and would be barred by the non-retroactivity doctrine in

*Teague v. Lane*, 489 U.S. 288 (1989).

## HABEAS GROUNDS XII and XIII

### CROSS'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING FAILURE TO OBJECT TO THE AUTOPSY AND FAILURE TO INVESTIGATE THE CRIME SCENE ARE PROCEDURALLY DEFAULTED.

Cross argues that trial defense counsel failed "to object to incompetent and unreliable

examination of the victim that resulted in contradictory results."  Additionally, in his next claim,

80

he argues that trial defense counsel failed to investigate "the contaminated crime scene and the unauthorized people in the crime scene on the day of the murder…." Cross abandoned these claims when he chose not present either claim to the Kentucky Court of Appeals. Failure to present a claim on appeal or motion for discretionary review to the state appellate court operates as a procedural default, unless state law provides otherwise. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Stanford v. Parker*, 266 F.3d 442, 451 (6th Cir. 2001); *Alley v. Bell,* 307 F.3d 380, 385-386 (6th Cir. 2002).

In any event, Cross's claims are meritless.  While the claims were not raised in the Kentucky Court of Appeals, Cross raised similar claims[19] in his RCr 11.42 collateral attack motion. TR VI, Motion 11.42, 4, 36-37.  The Commonwealth addressed each claim in its response to Cross's RCr 11.42 motion.  TR IX, 1145, 1146.  The trial court, in disposing of the issues, found that, in regard to the autopsy, Cross had called his own expert, the former chief medical examiner for Kentucky who testified on behalf of the defense.  The trial court also noted that Cross's claim regarding unauthorized parties at the crime scene, along with other allegations, were too general and failed to show any right to relief.  TR IX, 1187-1188. The Kentucky Court of Appeals found:

> Dr. Levaughn's testimony was thoroughly contradicted by the testimony of Cross's forensic pathologist, Dr. George Nichols. Dr. Nichols disputed Dr. Levaughn's conclusion as to the cause of

---

[19] In his collateral attack motion, Cross argued that his constitutional rights were violated by an unreliable examination of the victim and by unauthorized parties being at the crime scene, etc. He did not argue ineffective assistance of counsel.

81

> Jessica's death and claimed Dr. Levaughn had failed to gather
> evidence from the scene. Dr. Nichols also suggested possible
> causes of Jessica's death other than murder. The record clearly
> reflects that the performance of Cross's counsel in the handling of
> the Commonwealth's medical examiner was effective and
> appropriate.

*Cross v. Commonwealth*, 2014 WL 505575, *2 (Ky. App. 2014) (2011-CA-002136).  The

findings of the Kentucky Court of Appeals shows that the claims are meritless.

### HABEAS GROUNDS XIV and XVI

### CLAIMS OF ACTUAL INNOCENCE BASED ON NEWLY DISCOVERED EVIDENCE ARE NOT GROUNDS FOR FEDERAL HABEAS RELIEF.

Cross makes a claim of actual innocence based on additional evidence he now presents in

the form of a portion of an undated transcript of an alleged interview of Vinisha Stubblefield, and

affidavits from DPA[20] investigator Dale Elliot dated July 26, 2012, and from father of the victim

Joe Currin dated October 27, 2014.  Cross's claim that he is innocent is not new.  Cross's defense

at trial was that he did not commit any crimes relating to the murder of Jessica Currin.  Instead,

Cross pointed the finger at Jeremy Adams and Carlos Saxton as being the perpetrators of the

crimes.  Trial defense counsel vigorously cross-examined the Commonwealth's eyewitnesses

---

[20] Kentucky Department of Public Advocacy with the Innocence Project

Victoria Caldwell and Vinisha Stubblefield.[21]  See Attorney General's statement of Trial

Evidence, this memorandum.  Furthermore, Cross argued on collateral attack in the Kentucky

Court of Appeals that the Commonwealth's witnesses were not reliable.[22]  In fact, on page 3 of

his RCr 11.42 motion to vacate his sentence and judgment, Cross stated his claim of "actual

innocence" and reiterated his alternative perpetrator defense.  Also see, TR Motion 11.42, VI, 9,

---

[21] Vinisha was cross-examined about her prior statements, including a taped interview where she recanted which she had told KB I investigators.  VR: 3/31/08; 10:07:27-11:08:46.   Victoria was also cross-examined at length.  VR: 4/2/08; 10:02:03-11:42:52.  Trial defense counsel also called Victoria in the defense case with additional impeachment-type questioning including the playing of her recorded statement she had given to police in Santa Monica, California.  VR: 4/7/08; 10:24:15-11:11:51.  In addition, trial defense counsel called four witnesses to testify that Victoria was not always truthful.  VR: 4/3/08; 10:01:25; 1:37:49; 1:46:24; 1:53:57.

[22] *Cross v. Commonwealth*, 2014 WL 505575, *4 (Ky. App. 2014) (2011-CA-002136), found:

> Central to the defense's trial strategy was an effort to undermine the credibility of the Commonwealth's two key fact witnesses. The record reflects that defense counsel investigated Stubblefield and Caldwell, discovered they had lied in the past, and repeatedly brought the lies to the jury's attention. Cross's trial counsel impeached both witnesses with prior inconsistent statements they had made to investigators and elicited admissions from both of them that they had told numerous lies prior to trial. Their history of dishonesty was in the record, and doubts about their credibility were placed before jurors.
>
> Cross's allegation that his trial counsel failed to investigate the witnesses' pattern of lying to investigators, therefore, is entirely contradicted by the record. He has not presented evidence that his trial attorney's performance was deficient in this respect.

10, 33.  In addition, on pages 1 and 5 of his collateral attack appeal brief, in his Statement of the

Case, Cross reiterates his innocence. Although Cross's claim of innocence pervades his entire

collateral attack motion, it appears that Cross did not raise actual innocence as an actual claim.

Since Cross was aware of the claim and chose not to raise the claim, it is procedurally defaulted.

Furthermore, the allegations contained in the Stubblefield transcript and in the two affidavits

Cross attaches to his habeas petition are not new.  Cross has repeatedly claimed that all of the

investigations and witnesses were unreliable.  Cross's additional evidence is simply more of the

same.  Cross provides no explanation as to why the transcript and the affidavits were not

supplied in state court.

      "[A]s general matter, the burden is on the petitioner to raise his federal claim in the state

courts at a time when state procedural law permits its consideration on the merits, even if the

state court could have identified and addressed the federal question without its having been

raised."  *Bell v. Cone*, 543 U.S. 447, 451, fn. 3 (2005). In *McCleskey v. Zant*, 499 U.S. 467, 498

(1991), the U.S. Supreme Court explained, "If what petitioner knows or could discover upon

reasonable investigation supports a claim for relief in a federal habeas petition, what he does not

know is irrelevant.  Omission of the claim will not be excused merely because evidence

discovered later might also have supported or strengthened the claim." The petitioner must

demonstrate actual prejudice, not merely presumed prejudice, as to a procedurally defaulted

claim, even though presumed prejudice would otherwise apply. *Ambrose v. Booker*, 684 F.3d

638, 649-653 (6th Cir. 2012). Even if this court decides that Cross's claim of actual innocence is not procedurally defaulted, his claims are unexhausted.

In any event, and most importantly, *Herrera v. Collins*, 506 U.S. 390 (1993), holds that claims of actual innocence based on newly discovered evidence are not grounds for federal habeas relief. Any attempt by this court to go beyond *Herrera* would be a violation of *Teague v. Lane*, 489 U.S. 288 (1989).

## HABEAS GROUND XV

### CROSS'S CLAIM REGARDING "INEFFECTIVE ASSISTANCE OF APPELLANT-POST CONVICTION COUNSEL" IS PROCEDURALLY DEFAULTED.

Cross raises the following claim: "Ineffective Assistance of Appellant-Post conviction Counsel for not raising the issue of the trial court not holding a hearing regarding Vanisha [sic] Stubblefield and Victoria Caldwell not being able to tell the truth and the amount of false statements both girls told police and the courts." Cross also notes that the claim was "documented" in, *inter alia*, his RCr 11.42 [motion]. Cross's claim should have and could have been raised in his *pro se* post-conviction RCr 11.42 motion to vacate or set aside the underlying judgment. *Hollon v. Commonwealth*, 334 S.W.3d 431 (Ky. 2010). *Hollon* became final on April 21, 2011. Cross's RCr 11.42 motion was tendered for filing on June 6, 2011. A federal constitutional claim not presented to state courts at the time and in the manner prescribed by state law is treated as a procedurally defaulted claim.

Even if the claim were not procedurally defaulted, the claim, as recited by Cross is not sufficient to establish ineffective assistance of appellate counsel. The truthfulness, or lack thereof, of a witness is not established by a trial court hearing, it is established by confrontation during cross-examination. As the United States Supreme Court determined many years ago:

> Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158 (1970) (footnote omitted).

In this case, the jury was permitted, after listening to the direct examination and extensive cross-examination of each witness, to determine that both were credible. Any ruling by this court that the trial court should have determined witness credibility pre-trial would violate *Teague v. Lane*, 489 U.S. 288 (1989).

## CONCLUSION

For the foregoing reasons, the Attorney General requests this Court to deny the writ and dismiss the petition with prejudice.

Respectfully submitted,

**ANDY BESHEAR**
ATTORNEY GENERAL OF KENTUCKY

s/Susan Roncarti Lenz
**SUSAN RONCARTI LENZ**
ASSISTANT ATTORNEY GENERAL
OFFICE OF CRIMINAL APPEALS
ATTORNEY GENERAL'S OFFICE
1024 CAPITAL CENTER DRIVE
FRANKFORT, KENTUCKY 40601-8204
(502) 696-5342 Office
(502) 696-5533 Fax
susan.lenz@ky.gov

COUNSEL FOR RESPONDENT

## NOTICE

Please take notice that the foregoing Respondent's Rule 5 Answer and Memorandum of Law Opposing Habeas Petition was electronically filed with the Clerk of the United States District Court, Western District of Kentucky at Paducah by using the CM/ECF system on this 7th day of January, 2016.

s/Susan Roncarti Lenz
SUSAN RONCARTI LENZ
Assistant Attorney General

## CERTIFICATE OF SERVICE

I further certify that a true copy of the foregoing Rule 5 Answer and Memorandum of Law Opposing Habeas Petition was mailed, U.S. Mail, postage prepaid to Quincy Omar Cross, #156845, Western Kentucky Correctional Complex, 374 New Bethel Church Road, Fredonia KY 42411, this 7th day of January, 2016.

s/Susan Roncarti Lenz
SUSAN RONCARTI LENZ
Assistant Attorney General